Filed 7/6/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069661 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FELSS903428 ) |
| MARTIN FIELD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, Lorenzo R. Balderrama, Judge.  Remanded for further proceedings.

Ronald R. Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

Martin Field was committed to a mental hospital after a jury found he was a sexually violent predator (SVP) under the Sexually Violent Predators Act (Welf. & Inst.

Code,[1] § 6600 et seq. (SVPA or the Act)).  Field appeals, contending (1) the court prejudicially erred by failing to provide a certain pinpoint jury instruction; (2) the repeated use of the term "sexually violent predator" during trial violated his due process rights; (3) the court prejudicially erred in failing to properly instruct the jury regarding the meaning of the word "likely"; (4) cumulative error requires reversal; (5) the SVPA violates the equal protection, double jeopardy, due process, and ex post facto clauses of the federal constitution; and (6) his equal protection rights under the state and federal constitutions were violated when the court permitted the District Attorney to call Field as a witness over his objection.  Regarding Field's last contention, he argues that because a person found not guilty of crimes by reason of insanity (NGI) may not be compelled to testify at hearings to extend his or her commitment, neither should a person found to be an SVP be compelled to testify.

We conclude Field's equal protection claim involving testifying at trial may have merit and remand the matter to the superior court for an evidentiary hearing on that issue. We reject Field's other contentions.

FACTUAL AND PROCEDURAL BACKGROUND

A.  Field's Sexual Misconduct

Field has a long history of sexual misconduct.  In 1972, Field convinced a five-year-old boy that was playing outside to follow Field inside his home.  Once inside, Field molested him.  Field was convicted of violating Penal Code section 288.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

The following year, Field married a woman named Patricia and lived with her and her three sons, whom he adopted. From around 1974 to 1981, Field molested his adopted son Joseph. Joseph was about five years old at the time Field started molesting him. Field would fondle and orally copulate Joseph and then force Joseph to fondle him. During this time, Field also was regularly molesting one of his other sons, Eric. Field molested Eric over the course of several years, starting when Eric was around four years old. Field forced Eric to submit to and perform oral copulation.

During this same time period, Field also molested a nine-year-old cousin of Joseph and Eric. Field was convicted of violating Penal Code section 288 for his offenses against Eric. He subsequently was committed to a state hospital for treatment as a mentally disordered sex offender. However, he was kicked out of treatment and sent back to prison because he disregarded the hospital's rules and was "unamenable to treatment."

After Field was released, Field moved to Montana with his wife and Eric. In 1986, Field was convicted of molesting his young neighbor, who was nine or 10 years old at the time, after he kissed the boy all over his genital area and body. He was sentenced to 16 years in prison with eight years suspended.

After Field was released for this offense, for the next eight years, Field would have sex with teenage boys in an attempt to "change his sexual attraction" from young boys. The boys were reported to be between 15 and 18 years old. Field claimed they were all over the age of 16.

3

Field became a long haul truck driver so that he could reduce his contact with children. While on the road as a truck driver, Field had sex with prostitutes, both male and female, but stated they were all above the age of consent.

Also, while working as a truck driver Field was at a truck stop when he saw two young children by themselves. He bought them food and gave them money to play video games. When the manager came by and saw Field with the children, he asked Field if he was related to the children. When Field said no, the manager told the children to leave.

In 1991, Field wrote a letter to Joseph and said that if he had the opportunity, he would molest Joseph's three-year-old son.

During this time, Field was vocal about his sexual attraction to children.

In 2006, Field was arrested for possession of amphetamine and controlled substance paraphernalia. While he was in custody, Field started rubbing the leg and genital area of an inmate he was handcuffed to, despite the man's attempts to stop him. The inmate was a young man in his early 20's.

Field has been housed at Coalinga State Hospital since 2009. He has not participated in treatment there. Between 2012 and 2013, there were three incidents involving Field at the hospital. Field grabbed the hand of another patient and put it on his crotch. Field also gave another patient an enema after the patient asked for one. A nurse was present outside the open door while Field gave the patient an enema. Finally, Field kissed the forehead of a demented, older male patient and put his arm around him. Field claimed the patient needed some support.

4

At the time of his trial, Field was 63 years old. He planned to return to work as a truck driver if released.

Prosecution's Experts[2]

Drs. Erik Fox and Preston Sims are licensed psychologists who testified for the prosecution. Both worked as SVP evaluators for the Department of State Hospitals, and evaluated Field to determine whether he met the statutory criteria for civil commitment as an SVP. The applicable criteria consists of: (1) was the individual convicted of a qualifying sexually violent offense; (2) does the individual have a diagnosable mental disorder predisposing him to commit criminal sexual acts; and (3) is the individual likely to commit future predatory sexually violent acts.

Dr. Fox reviewed Field's medical and criminal records as well as his sexual history. He found that the 1972 and 1981 convictions were qualifying offenses under the SVPA. Based on his review of Field's "long history of having an arousal to children and acting on that arousal," he diagnosed Field with pedophilic disorder, alcohol dependence, amphetamine abuse, and a personality disorder. Dr. Fox explained that pedophilic disorder is a lifelong condition that cannot go into remission. Given that Field's numerous convictions, incarcerations, and attempts to receive treatment did not deter his criminal conduct, Dr. Fox opined that Field's pedophilic disorder caused him serious difficulty controlling his behavior.

---

[2]     Although a proceeding under the SVPA is civil in nature (*People v. Allen* (2008) 44 Cal.4th 843, 860, we follow the common practice of characterizing the parties to the action as the "prosecution" and "defense" (see, e.g., *id*. at p. 866).

Dr. Sims also diagnosed Field with pedophilic disorder. Dr. Sims noted that, as recently as 2006, Field had told his probation officer that he was a pedophile and, in 2009, he also told his evaluators that he was sexually attracted to children. He also noted that although Field was only convicted for his sexual offenses as to one of his adopted sons, Field had since admitted that he molested all three. Dr. Sims opined that Field was sexually preoccupied and that, given the frequency of his offenses and convictions, Field had emotional and volitional impairment.

Both doctors opined that, as a result of his mental disorder, Field was likely to engage in sexually violent predatory behavior if released. They based their opinions, in part, on the use of the Static-99R, an actuarial tool used to assess an offender's risk of recidivism. Both doctors independently scored Field as a six on the diagnostic scale, which placed him in the high risk category. Field's risk score placed him within a group of offenders that have a 29.4 percent recidivism risk within a five-year period, which Dr. Fox opined was a "substantial" risk.

Defense Expert

Dr. Mary Jane Alumbaugh, a licensed psychologist, evaluated Field and testified in his defense. She diagnosed Field with pedophilic disorder; however, she opined that Field did not have serious difficulty controlling his pedophilic behavior. She based her opinion on the fact that Field is getting older and explained that recidivism literature shows a decline in sexual offenses as a person ages. She noted that Field's last offense was in 1987 and that during the time he was in the community, between periods of incarceration or commitment, he did not offend against children. Using the Static-99R

6

assessment tool, Dr. Alumbaugh scored Field with a three, which put him in the "low/moderate risk category." Based on these considerations, Dr. Alumbaugh opined that Field was not likely to reoffend, and thus that he was not an SVP.

DISCUSSION

I

*SVPA*

We need not provide a detailed explanation of the SVPA as the California Supreme Court has done that on numerous occasions. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646 (*Reilly*); *In re Lucas* (2012) 53 Cal.4th 839, 845; *People v. McKee* (2010) 47 Cal.4th 1172, 1183, 1185 (*McKee I*); *People v. Roberge* (2003) 29 Cal.4th 979, 982, 984 (*Roberg*e); *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 893, 902 (*Ghilotti*).)

Suffice it to say, the SVPA provides for indefinite involuntary civil commitment of certain offenders who are found to be SVP's following the completion of their prison terms. (*McKee I*, *supra*, 47 Cal.4th at pp. 1186-1187.) Except for nonsubstantive differences in grammar, the SVPA tracks verbatim the Kansas SVP law approved in *Kansas v. Crane* (2002) 534 U.S. 407 (*Crane*), and *Kansas v. Hendricks* (1997) 521 U.S. 346 (*Hendricks*). (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1157 (*Hubbart*).) Section 6600, subdivision (a)(1), states: " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

7

To establish that a person is an SVP, the prosecution is required to prove the following: (1) the offender has been convicted of a qualifying sexually violent offense against at least two victims; (2) the offender has a diagnosed mental disorder; (3) the disorder makes it likely the offender would engage in sexually violent conduct if released; and (4) this sexually violent conduct will be predatory in nature. (*Roberge*, *supra*, 29 Cal.4th at pp. 984-985.) The prosecutor must establish these elements beyond a reasonable doubt and the jury verdict must be unanimous. (*Reilly*, *supra*, 57 Cal.4th at p. 648.)

II

*JURY INSTRUCTIONS*

Field raises two issues regarding jury instructions. First, he claims the trial court prejudicially erred in refusing to provide a pinpoint instruction telling the jury that Field's mental diagnosis must cause him serious difficulty controlling his behavior. Second, Field contends the court did not properly instruct the jury as to the definition of "likely." We reject both contentions.

A. The Requested Pinpoint Instruction

Prior to trial, Field filed a motion requesting the trial court to provide the jury with the following pinpoint jury instruction modifying CALCRIM No. 3454:

> "In order to find that Respondent meets the criteria as a sexually violent predator, as that term is described in these instructions, Petitioner must prove that:
>
> "1. Respondent suffers from a diagnosed mental disorder, as defined elsewhere in these instructions;

8

"AND

"2.  That diagnosed mental disorder must cause Respondent to have serious difficulty in controlling his sexually violent behavior;

"AND

"3.  As a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually predatory criminal behavior."

The prosecutor opposed the motion, arguing that the California Supreme Court held the standard definition of "diagnosed mental disorder" contained in CALCRIM No. 3454 encompassed the requested pinpoint instruction and that no additional language was necessary.  The trial court denied the motion and provided the jury with an instruction consistent with CALCRIM No. 3454 as follows:

"The petition alleges that Martin Field is a sexually violent predator. To prove this allegation, the People must prove beyond a reasonable doubt that:  One, he has been convicted of committing sexually violent offenses against one or more victims; two, he has a diagnosed mental disorder; and, three, as a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior.

"The term 'diagnosed mental disorder' includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predisposed[3] that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others.

"A person is more likely to engage in a sexually violent predatory criminal behavior if there is a substantial danger, that is, a serious and well-founded risk, that the person will engage in such conduct if

---

3    The trial court used the word "predisposed" when it instructed the jury.  The written instruction, however, contained the term "predispose."

9

released into the community.  The likelihood that the person will engage in such conduct does not have to be greater than 50 percent but be much more than a mere possibility."

## B.  Analysis

Relying on *Crane, supra,* 534 U.S. 407, Field contends that, under federal law, a person cannot be subjected to civil commitment unless he suffers from a mental disorder making it seriously difficult for him to control his dangerous behavior.  Field thus asserts the trial court committed reversible error by denying his request for a pinpoint instruction that explained this legal principle.

In *People v. Williams* (2013) 31 Cal.4th 757 at pages 774 through 776 (*Williams*), the California Supreme Court rejected a substantially similar argument to that made by Field.  In that case, the petitioner challenged his commitment under the SVPA, arguing the jury in his case did not receive special, specific instruction regarding the need to find serious difficulty in controlling behavior.  (*Williams*, *supra*, at pp. 759-760.)  The court held that specific impairment-of-control instructions are not constitutionally required in California.  (*Id*. at pp. 776-777.)  The court reasoned the language of the SVPA "inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior." (*Williams, supra,* at p. 759.)

The court also expressly concluded that "[*Crane*], *supra*, 534 U.S. 407, does not compel us to hold that further lack-of-control instructions or findings are necessary to support a commitment under the SVPA."  (*Williams*, *supra*, 31 Cal.4th at pp. 774-775.) In reaching this conclusion, our high court emphasized:  "[A] judicially imposed

10

requirement of special instructions augmenting the clear language of the SVPA would contravene the premise of . . . [*Crane*], *supra*, 534 U.S. 407, that, in this nuanced area, the Legislature is the primary arbiter of how the necessary mental-disorder component of its civil commitment scheme shall be defined and described." (*Williams*, *supra*, at p. 774; italics omitted.)

Field acknowledges *Williams*, *supra*, 31 Cal.4th 757, but argues that *Crane*, *supra*, 534 U.S. 407 and *Williams* are in conflict, and as such, we must follow the opinion of the United States Supreme Court. (See *Cooper v. Aaron* (1958) 358 U.S. 1, 17-19.) However, in *Crane*, the United States Supreme Court did not address the constitutionality of the SVPA, but, in *Williams*, the California Supreme Court did so while considering the impact of *Crane* as part of its analysis. (See *Williams*, *supra*, at pp. 774-775.) Therefore, we do not agree that the two cases are in conflict on the issue before us. Consequently, Field is asking us to either ignore or overrule *Williams*. This we cannot do. We are bound by *Williams* and thus summarily reject Field's argument. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)

Alternatively, Field asserts that even if we follow *Williams*, *supra*, 31 Cal.4th 757, and find, in general, CALCRIM No. 3454 is proper, under the specific circumstances of this case, a pinpoint instruction was necessary. To this end, Field insists when the trial court instructed the jury with the word "predisposed" instead of "predispose" within CALCRIM No. 3454, it rendered the instruction ambiguous. Field claims that the use of the word "predisposed" allowed the prosecution to emphasize

11

Field's recidivism to prove volitional impairment as opposed to requiring the prosecution to prove that he has a serious difficulty in controlling his behavior.

The People point out that Field did not challenge the court's use of the word "predisposed" at trial, and therefore, Field forfeited his instant challenge. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) We agree with the People on this point. Yet, even if we were to consider Field's contention on the merits, we would find his argument wanting.

As Field is claiming the jury instruction is ambiguous, we must view the instructions as a whole to determine whether there was a reasonable likelihood the jury was misled by the claimed error. (*People v. Tate* (2010) 49 Cal.4th 635, 696.) Field argues that the term predispose "carries none of the meaning of having a 'serious difficulty in controlling behavior' " and that it "connotes no more than an inclination or a tendency . . . ." However, the jury also was instructed it must find that Field's diagnosis affected his ability to control his behavior and that he posed a "substantial danger" to others, such that there is a "serious and well-founded risk" that he will commit sexual criminal acts if released into the community. These instructions, considered together, made clear to the jury that Field's mental diagnosis must so affect his ability to control himself that he is a substantial danger to others and likely to recommit sexual offenses. Put differently, CALCRIM NO. 3454 required Field to be indefinitely committed as an SVP if the prosecution proved beyond a reasonable doubt that he had serious difficulty controlling his deviant behavior. The fact that the judge instructed the jury with the word "predisposed" in lieu of "predispose" did not meaningfully alter CALCRIM No. 3454 or otherwise render it ambiguous.

12

Finally, the foundation of Field's alternative argument remains that we must follow *Crane*, *supra*, 534 U.S. 407. As we discuss above, we lack the discretion to simply ignore *Williams*, *supra*, 31 Cal.4th 757, which addressed the very jury instruction challenged here. (See *Auto Equity*, *supra*, 57 Cal.2d at p. 455.) Further, there is nothing in the record that compels us to distinguish *Williams* from the instant case. There was no error in the trial court providing CALCRIM No. 3454 to the jury and refusing to provide Field's requested pinpoint instruction.

## C. The Definition of "Likely"

Prior to trial, Field moved to add language to the definition of the term "likely" in CALCRIM No. 3454. Field asked the court to modify a portion of the instruction so the sentence, "The likelihood that the person will engage in such conduct does not have to be greater than 50 percent" would include the clause, "but must be more than the mere possibility that he will engage in such conduct." After hearing argument from the parties, the court granted Field's motion and agreed to modify the jury instruction.

At trial, the court modified the instruction as follows: "The likelihood that the person will engage in such conduct does not have to be greater than 50 percent but be much more than a mere possibility." There is no indication in the record that Field objected to this modified version at trial.

Now, Field maintains the trial court erred in providing the jury with the modified instruction because it was incomprehensible, at best, and misleading, at worst. We disagree.

13

As a threshold issue, the People point out that Field did not object to the modified instruction at trial. Thus, they contend Field forfeited the issue. In general, a party may not complain on appeal that a given instruction was incomplete or unclear unless the party requested an appropriate clarifying instruction. (*People v. Bolin* (1998) 18 Cal.4th 297, 329.) Here, we are faced with a somewhat unique situation. Field requested a modified instruction, the court agreed to provide the modified instruction, but the actual modified instruction is slightly different than the version requested by Field. That said, we are troubled by Field's failure to object at trial in light of his insistence on appeal that the instruction as given clearly was either incomprehensible or misleading. If the jury instruction was so obviously incorrect, it begs the question why Field did not object at trial particularly when the court was attempting to instruct the jury as he requested. Viewing the lack of objection at trial in this context, we tend to agree with the People that Field forfeited this challenge.

In regard to the forfeiture issue, Field frames the issue as the trial court neglecting its sua sponte duty to instruct on general principles of law. In other words, Field maintains that he had no duty to object to the instruction because it is not a correct statement of law. We are not persuaded.

"[T]he phrase '*likely* to engage in acts of sexual violence' . . . , as used in section 6601, subdivision (d), connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination that the chance of reoffense is *better than even*. Instead, an evaluator applying this standard must

14

conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*Ghilotti*, *supra*, 27 Cal.4th at p. 922; *Roberge*, *supra*, 29 Cal.4th at p. 989 [following *Ghilotti's* definition of "likely" in regard to section 6600, subdivision (a)].)

As relevant here, the trial court instructed the jury with a modified version of CALCRIM No. 3454 as follows: "A person is likely to engage in sexually violent predatory criminal behavior if there is a substantial danger, that is, serious and well-founded risk that the person will engage in such conduct if released into the community. The likelihood that the person will engage in such conduct does not have to be greater than 50 percent but be much more than a mere possibility." Thus, the jury was told that to find Field was an SVP, there had to be a "substantial danger" and a "serious and well-founded risk," that he would reoffend if released. Such language tracked the language in *Roberge*, *supra*, 29 Cal.4th at page 988. Further, we are not troubled by the modification of the last sentence above. Although the court could have stated it more artfully, the use of the conjunction "but" makes clear that to find Field was likely to reoffend, the jury had to be convinced that the likelihood Field would reoffend needed to be much more than a mere possibility. Considering the instruction as a whole (see *People v. Tate, supra,* 49 Cal.4th at p. 696), we are confident that no reasonable juror would have understood the instruction to conclude a mere possibility of reoffending would suffice to qualify Field as

15

an SVP. The instruction was accurate as given and satisfactorily tracked the definition of likely articulated in *Ghilotti*, *supra*, 27 Cal.4th 888 and *Roberge*, *supra*, 29 Cal.4th 979.

## III

### *USE OF THE TERM "SEXUALLY VIOLENT PREDATOR"*

Field next argues that the use of the term "sexually violent predator" during his commitment proceeding was unnecessarily inflammatory and a denial of his federal due process rights. We reject this argument.

### A. Background

Field moved in limine to bar, during trial, the use of the term "sexually violent predator." He asked that words like "meets the criteria" be substituted for "sexually violent predator" and "qualifying offense" be substituted for "sexually violent offense." The trial court denied the motion, noting, "Certainly I think there's no way of getting around using the term that the legislature [has] chosen."

### B. Analysis

Field notes that our high court recognized that the SVPA has an "ominous name." (See *Hubbart, supra,* 19 Cal.4th at p. 1142.) Despite this observation, the California Supreme Court was not asked to address the use of the term "sexually violent predator," but instead held that the SVPA's scheme did not violate due process, equal protection, and ex post facto principles. (*Hubbart*, *supra*, at pp. 1142-1143.) Nevertheless, based on *Hubbart*, Field insists that the term "sexually violent predator" "is a name that is gratuitously and prejudicially ominous." He then concludes that its repeated use before the jury was a denial of due process. We disagree.

16

Initially, we observe that Field has not cited any authority where a court found that the use of the term "sexually violent predator" during a trial under the SVPA was found to be prejudicial or a violation of the defendant's due process rights. Instead, Field relies on cases that are not instructive here.

For example, Field cites *People v. Earle* (2009) 172 Cal.App.4th 372 at page 410 for the proposition that the term "predator" can incite passion and prejudice. However, Field glosses over the context in which the court made its statement. In that case, the court was troubled that the prosecutor used the defendant's act of indecent exposure to argue that the defendant was a "loathsome and dangerous pariah" who decided to commit sexual assault. (*Id*. at p. 411.) The court cautioned against "the inherent potential of the indecent exposure to convey an inflammatory impression of defendant as a deviant or pervert." (*Id*. at p. 410.) It was in this vein that the court cautioned that the term "predator" can incite passion and prejudice. (*Ibid*.) Nevertheless, the court also stated that the term predator "connotes . . . one who habitually commits sex offenses characterized by violence, pedophilia or both." (*Ibid*.) It then notes that the SVPA concerns sexually violent predators. (*Earle, supra,* at p. 410.) It is undisputed that Field has sexually assaulted minors. It is undisputed that Field is a pedophile. Indeed, Field has a long and disturbing history of molesting young boys. In short, Field is precisely the type of sexually violent predator the SVPA was meant to address.

Similarly, we are unpersuaded by Field's reliance on a litany of non-SVPA cases wherein courts found misconduct when the prosecutors used certain epithets like "slimy crook" or "Nazi." Here, the trial concerned whether Field should be committed

17

indefinitely to a mental hospital under the SVPA, which required the jury to find Field was a sexually violent predator. Thus, the term "sexually violent predator" needed to be defined to the jury and the prosecution had to prove beyond a reasonable doubt that Field fit that definition. There was nothing improper about the use of the term "sexual violent predator" during the trial.[4]

## IV

### *CUMULATIVE ERROR*

Field also contends the cumulative effect of the asserted errors rendered the trial so unfair and unlawful that reversal of the judgment is warranted. Because we hold no errors exist, this cumulative error argument necessarily fails. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative effect of errors when no error]; *People v. Butler* (2009) 46 Cal.4th 847, 885 [rejecting cumulative effect claim when court found "no substantial error in any respect"].)

## V

### *CONSTITUTIONALITY OF THE SVPA*

Field also asserts the SVPA violates due process, ex post facto, and double jeopardy provisions of the United States Constitution. In addition, he argues the SVPA violates equal protection because the burden of proof is placed on SVP's when they seek release from civil confinement and the Act's term of confinement is indefinite. We have considered these arguments in light of our Supreme Court's opinion in *McKee I*, *supra*,

---

[4] We note that Field does not argue that substantial evidence does not support the jury's finding below.

18

47 Cal.4th 1172, and this court's final opinion on remand in the same case, *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*). Based on these opinions, we reject Field's assertions.

### A. Due Process and Ex Post Facto Challenges

Field argues the indeterminate commitment term under the SVPA violates the federal constitution's due process clause. He also contends the SVPA violates the ex post facto clause of the federal constitution. Nevertheless, he acknowledges the California Supreme Court has decided against his position on these points. (*McKee I*, *supra*, 47 Cal.4th at pp. 1184, 1188-1195.) *McKee I* is binding on us. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455.) We thus summarily reject these challenges.

### B. Double Jeopardy Challenge

Additionally, Field maintains his indeterminate commitment under the SVPA violates the federal constitution's double jeopardy clause as the Act is punitive. Also, he insists that the restrictions he faces while petitioning for release (he must be committed for a year before petitioning for release and he bears the burden to prove his suitability for release) renders the SVPA punitive and thus in violation of the double jeopardy clause. In support of his argument, he urges us to follow *Hendricks*, *supra*, 521 U.S. 346. In doing so, he emphasizes certain differences between the SVPA and the Kansas law considered by the United States Supreme Court in *Hendricks* and argues that if we focus on these differences, we would have to conclude the SVPA is punitive and therefore violates the double jeopardy clause.

However, Field's argument overlooks that the California Supreme Court, considering the factors articulated by the United States Supreme Court in *Hendricks*, *supra,* 521 U.S. 346, determined the SVPA is not punitive. (*McKee I*, *supra*, 47 Cal.4th at pp. 1194-1195.) We must follow *McKee I*. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455.) Because Field's double jeopardy challenge to the Act hinges on our finding that the SVPA is punitive, this challenge necessarily fails.[5]

## C. Equal Protection Challenge

Field contends that his indeterminate term under the SVPA violates his right to equal protection. He argues SVP's are similarly situated to mentally disordered offenders (MDO's) and NGI's, but the groups are treated differently because MDOs' and NGI's are committed for a limited period of time although, in contrast, SVP's are committed indeterminately. He also maintains that his equal protection rights are violated by the SVPA's requirement that SVP's have the burden of proof for release, unlike the MDO and NGI commitment procedures wherein the People have the burden of proof to show that the patients should be recommitted. He therefore requests that we remand the instant case for a hearing to determine if the People can justify his disparate treatment.

---

[5] A similar double jeopardy challenge based on *Hendricks*, *supra*, 521 U.S. 346 was rejected by our colleagues in Division Three. (See *People v. Landau* (2013) 214 Cal.App.4th 1, 44-45 (*Landau*).) We find Division Three's reasoning on that issue persuasive and follow it here. As such, for the reasons expressed in *Landau*, *supra*, at pages 44 through 45, we reject Field's double jeopardy argument as well.

20

In making his contentions, however, Field acknowledges that we addressed these issues in *McKee II*, *supra*, 207 Cal.App.4th 1325.  Nevertheless, he asks us to "consider the issue independently" because we wrongly decided *McKee II*.  We decline to do so.

In *McKee I*, *supra*, 47 Cal.4th 1172, the Supreme Court held the SVPA is subject to equal protection analysis because it "treats SVP's significantly less favorably than those similarly situated individuals civilly committed under other statutes" including MDO's and NGI's.  (*McKee I*, *supra*, at pp. 1196, 1203, 1207.)  Because individuals within each of these categories "have the same interest at stake—the loss of liberty through involuntary civil commitment—it must be the case that when society varies the standard and burden of proof for SVP's . . . , it does so because of the belief that the risks involved with erroneously freeing SVP's from their commitment are significantly greater than the risks involved with freeing" other civil committees.  (*Id*. at p. 1204.)

The Supreme Court remanded the case for a hearing on whether the People could justify disparate treatment for SVP's.  The court instructed:  "It must be shown that, notwithstanding the similarities between SVP's and [other civil committees], the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society.  This can be shown in a variety of ways.  For example, it may be demonstrated that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely.  Or it may be that SVP's pose a greater risk to a particularly vulnerable class of victims, such as children . . . .  Or the People may produce some other justification."  (*McKee I*, *supra*, 47 Cal.4th at p. 1208, fn. omitted.)

21

After remand, the superior court conducted a 21-day evidentiary hearing on the justification of disparate treatment for SVP's and concluded the People had met their burden. On appeal, we reviewed the matter de novo, which was the correct standard of review. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.) Field contends we applied a more deferential standard of review, implying that we employed a substantial evidence review.[6] He is mistaken. In *McKee I*, Field singles out the reference to " ' "reasonable inferences based on substantial evidence" ' " without reading the context of the passage: "When a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body ' "has drawn reasonable inferences based on substantial evidence." ' " (*McKee I*, *supra*, 47 Cal.4th at p. 1206.) In *McKee II*, we concluded "[t]he People have shown 'that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely[;] . . . that SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of

---

6     Field somewhat confusingly argues that we improperly applied a rational relationship type review instead of a strict scrutiny review. As we discuss above, we applied a de novo review in *McKee II*. Instead, we interpret Field's argument that we improperly applied the strict scrutiny test although he does not cogently argue as much. Nonetheless, we note that our Supreme Court in *McKee I, supra,* 47 Cal.4th 1172, did not require a finding that the government use the least restrictive means available to meet the state's compelling interest to allow the SVPA to pass constitutional muster. We expressly rejected that argument in *McKee II*, concluding the least restrictive means available requirement applies only to disparate treatment of a suspect class. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.) Our colleagues in Division Three also rejected that argument. (*People v. McDonald* (2013) 214 Cal.App.4th 1367, 1380 (*McDonald*).) To the extent Field is attempting to make a similar argument here, we reject it for the same reasons articulated in *McKee II* and *McDonald*.

victims, such as children'; and that SVP's have diagnostic and treatment differences from MDO's and NGI's, thereby supporting a reasonable perception by the electorate . . . that the disparate treatment of SVP's under the amended [SVPA] is necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)  The Supreme Court denied a petition for review, making *McKee II* final.

As Field notes, this court has, of course, followed *McKee II, supra,* 207 Cal.App.4th 1325, and other Courts of Appeal have as well.  (See, e.g., *McDonald*, *supra*, 214 Cal.App.4th at pp. 1376-1382; *Landau*, *supra*, 214 Cal.App.4th at pp. 47-48; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1085-1086; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864.)  Although it is clear Field believes the evidence relied on in *McKee II* is insufficient to justify disparate treatment of SVP's, we have carefully evaluated it and conclude otherwise.[7]

## VI

### *FIELD'S TESTIMONIAL PRIVILEGE*

Field maintains that the trial court erred by allowing the prosecutor to call him as a witness in his commitment trial.  Relying on *Hudec v. Superior Court* (2015) 60 Cal.4th

---

[7]    For example, Field contends we erred in *McKee II*, *supra*, 207 Cal.App.4th 1325 by:  (1) only looking at evidence of the recidivism of sex offenders and (2) failing to consider evidence comparing the trauma suffered by victims of the crimes committed by SVP's with the trauma experienced by victims of crimes committed by MDO's and NGI's. In addition, he contends the evidence of "diagnostic and treatment differences" is not relevant to the issues he raises here.

815 (*Hudec*), Field asserts that SVP's are similarly situated to NGI's, and therefore, he had an equal protection right not to be called to testify.[8]  In response, the People insist the legislative and procedural differences between NGI's and SVP's establish that the two groups are not similarly situated for purposes of testimonial privilege.  In the alternative, the People argue that even if SVP's and NGI's are similarly situated, a rational basis supports any disparate treatment.

Field's argument before us was successfully made in *People v. Curlee* (2015) 237 Cal.App.4th 709 (*Curlee*).  In that case, the appellate court recognized that a necessary prerequisite to a valid equal protection claim is that the groups being compared must be "similarly situated" with respect to the particular right in question.  (*Id.* at p. 720.)  After reviewing *McKee I, supra,* 47 Cal.4th 1172, which determined SVP's were similarly situated to NGI's with respect to the burden of proof and length of their commitments, the court concluded SVP's were similarly situated to NGI's for purposes of the right against self-incrimination.  The court reasoned, "Both groups have committed a criminal act and have been found to suffer from a mental condition that might present a danger to others.  [Citation.]  At the end of the SVP's prison term, and at the end of the term for which an NGI could have been imprisoned, each is committed to the state hospital for treatment if, at the end of that period, the district attorney proves in a jury trial beyond a reasonable doubt that the person presents a danger to others as a result of a mental disease, defect, or

---

8    Our high court concluded that persons who have been civilly committed after being found not guilty by reason of insanity have a statutory right to refuse to testify. (*Hudec*, *supra*, 60 Cal.4th at p. 826.)

disorder. [Citations.] The purpose of the commitment is the same: To protect the public from those who have committed criminal acts and have mental disorders and to provide mental health treatment for the disorders." (*Hudec, supra,* at p. 720.)

Next, the court examined whether the disparate treatment between SVP's and NGI's with respect to the right against self-incrimination was justified on the record before it. In doing so, the court noted that in *McKee II, supra,* 207 Cal.App.4th 1325, the state was able to justify the disparate treatment at issue in that case. It did so by showing "SVP's were more likely [than NGI's] to commit new sexual offenses when released . . .; victims of sex offenses suffered unique and, in general, greater trauma, than victims of other offenses; and SVP's were less likely to participate in treatment and more likely to be deceptive and manipulative than [NGI's]." (*Curlee*, *supra*, 237 Cal.App.4th at p. 721.)

However, as the court recognized, that showing was made during the course of an evidentiary hearing that occurred on remand from the Supreme Court's ruling in *McKee I*. (See *McKee I*, *supra*, 47 Cal.4th at pp. 1208-1209 [ordering remand]; *McKee II*, *supra*, 207 Cal.App.4th 1325 [appeal from remand hearing].) Because the equal protection issue presented in *Curlee* was different from the one raised in *McKee I*, and because the issue in *Curlee* had not been litigated in the trial court, the court in *Curlee* followed our high court's lead in *McKee I* and remanded the matter to allow the state the opportunity to demonstrate a constitutional justification for giving NGI's the right against self-incrimination but not SVP's. (*Curlee*, *supra*, 237 Cal.App.4th at p. 722.)

The opinion in *Curlee*, *supra*, 237 Cal.App.4th 709 was not filed before Field submitted his opening brief in the instant matter. Neither the respondent's brief nor the

25

reply brief discuss *Curlee*. As such, we asked for supplemental briefing regarding the impact of *Curlee* on the instant matter.

In their supplemental letter briefs, neither Field nor the People take issue with the holding in *Curlee, supra,* 237 Cal.App.4th 709 that SVP's and NGI's were similarly situated in regard to being called to testify at trial. In fact, the People point out that Division Three, in *People v. Landau* (2016) 246 Cal.App.4th 850, and Division Two, in *People v. Dunley* (2016) 246 Cal.App.4th 691 (*Dunley*),[9] both recently followed *Curlee*.[10] Like our colleagues in Division Two and Division Three, we too follow *Curlee* and find that SVP's are similarly situated to NGI's and MDO's as to the testimonial privilege.

Having found SVP's and NGI's similarly situated, we next must address whether the People have justified the disparate treatment. Before we do so, however, we address the proper equal protection test to be applied.

---

[9] After the People's letter, Division Two granted a rehearing in *Dunley, supra,* 246 Cal.App.4th 691, vacating the opinion. In a subsequent opinion, Division Two again concluded MDO's, SVP's, and NGI's are similarly situated with respect to the testimonial privilege, but ultimately found the appeal moot because the trial court denied a subsequent petition for recommitment based on the court's finding that the appellant no longer met the criteria for commitment as an MDO. (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1442-1443.)

[10] In their respondent's brief, the People took the position that SVP's and NGI's were not similarly situated in regard to the testimonial privilege. In light of the People's supplemental letter brief, we conclude the People have abandoned that position. To the extent they have not abandoned it, we reject it for the same reasons set forth in *Curlee*, *supra*, 237 Cal.App.4th at pages 720 through 721.

26

The People contend that any disparate treatment here need only be justified under the rational basis test. To this end, the People emphasize that our high court has held that the higher strict scrutiny standard of review is required only where "a constitutional right, such as the right to liberty from involuntary confinement is at stake." (*McKee I*, *supra*, 47 Cal.4th at p. 1206.) The People contend the right to refuse to testify at a commitment trial is nonconstitutional as it does not lengthen or alter the length on a commitment term and does not affect the definitional standards or burdens of proof for commitment. In support of their position, the People rely on *Hubbart, supra,* 19 Cal.4th 1138; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161 (*Hofferber*); and *In re Moye* (1978) 22 Cal.3d 457 (*Moye*).

In *Hubbart*, the California Supreme Court upheld the substantive definitional standards and the two-year commitment term prescribed under the former version of the SVPA. (*Hubbart*, *supra,* 19 Cal.4th at pp. 1151-1170.) In doing so, the court noted "this court has traditionally subjected involuntary civil commitment statutes to the most rigorous form of constitutional review -- an approach we follow in upholding the SVPA here." (*Hubbart*, *supra,* at p. 1153, fn. 20.)

In *Hofferber*, our high court upheld the constitutionality of civil commitments under the Lanterman-Petris-Short Act (LPSA). (*Hofferber*, *supra*, 28 Cal.3d at pp. 171-172.) The People emphasize in that case, the conservator conceded that because the challenged law subjected a person to involuntary commitment, it necessarily affected the conservatee's fundamental liberty interest, and the law was subject to strict scrutiny review. (*Id.* at p. 171, fn. 8.)

27

In *Moye*, the California Supreme Court held that statutes allowing for an NGI to be committed for a period of time longer than the maximum term punishable for the criminal offense violated equal protection principles because NGI's were similarly situated to defendants under the former Mentally Disordered Sex Offenders Act (MDSO), who were subject to a shorter commitment term. (*Moye, supra,* 22 Cal.3d at p. 466.) The court observed that because the "petitioner's liberty is at stake," the justification for the disparate treatment of NGI's and MDSO's as to the length of commitment must pass muster under strict scrutiny review. (*Id.* at p. 465.)

The People point out that *Moye*, *Hofferber*, and *Hubbart, supra,* 19 Cal.4th 1138 all involve a challenge to a portion of the law affecting the length of the committee's civil commitment term. Further, in *Moye* and *Hofferber*, the People conceded that strict scrutiny review was the applicable standard. (*Moye*, *supra*, 22 Cal.3d at p. 465; *Hofferber*, *supra*, 28 Cal.3d at p. 171, fn. 8.)

In summary, the People maintain the challenged issue here, an SVP's statutory right to refuse to testify at a commitment trial, does not affect the length of the commitment term, and does not involve the definitional standards or burden of proof for commitment. As such, the People claim the proper test is whether they can justify the disparate treatment under a rational basis test. We disagree.

California courts have not limited strict scrutiny review in cases concerning involuntary commitment only to situations involving the length of commitment, definitional standards, or burden of proof. For example, in *In re Gary W.* (1971) 5 Cal.3d 296 (*Gary W.*), and its companion case, *People v. Smith* (1971) 5 Cal.3d 313, the

28

Supreme Court concluded that a juvenile facing an extension of his or her commitment to the former California Youth Authority under section 1800 is entitled to a jury trial, noting that mentally disordered sex offenders were entitled by statute to jury trials (former § 6318), as are narcotics addicts (§§ 3050, 3051, 3108[11]).  The right to a jury trial is required by both due process and equal protection where there is no "compelling state purpose for the distinction between the class of persons subject to commitment pursuant to section 1800 and to other classes of persons subject to involuntary confinement" through civil commitment proceedings.  (*Gary W.*, *supra*, 5 Cal.3d at p. 307.)  *In Gary W.*, the right to a jury trial was based on statute.  (*Id.* at pp. 304-306; see *People v. Feagley* (1975) 14 Cal.3d 338, 348 (*Feagley*).)

In *Feagley*, one of the issues addressed by the Supreme Court was whether California could constitutionally deny to persons committed under the MDSO Act the right to a unanimous jury verdict, which it granted to persons committed under the LPSA. (*Feagley*, *supra*, 14 Cal.3d at p. 352.)  In analyzing this issue under equal protection principles, the court noted that it had characterized the right to a unanimous verdict under the California Constitution as "fundamental" and, per *People v. Smith, supra*, 5 Cal.3d at pages 318 through 319, California "must bear the burden of demonstrating there is a compelling interest which justifies this significant distinction between the rights of mentally disordered sex offenders and those of persons committed under the [LPSA], and that the distinction is necessary to further such purpose." (*Feagley*, *supra*, at p. 356.)

---

[11]    These statutes were repealed in 2015.

29

Accordingly, like it did in *Gary W.*, the court applied strict scrutiny review under equal protection when a "fundamental" right was granted to one group and not another similarly situated group. The grant of that right, however, was by statute.

Here, the right at issue is the statutory right not to testify under Penal Code section 1026.5, subdivision (b)(7) provided to NGI's, but not given to SVP's. The fact that the claimed right is found in a statute and not the California or United States Constitution does not mandate that we apply a rational basis review. (See *Gary W.*, *supra*, 5 Cal.3d at p. 307; *Feagley*, *supra*, 14 Cal.3d at p. 356.) And we are not persuaded by the People's claim that "the right at issue here touches on only a *single* procedural aspect of the trial process." (Italics in original.) To the contrary, the ability to call an SVP in the prosecution's case could be the most important evidence it places before the jury. As our Supreme Court observed, permitting the jury to observe the person sought to be committed and to hear him speak and respond provided "the most reliable proof and probative indicator of the person's present mental condition." (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 139.) Further, "[b]y calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case." (*People v. Haynie* (2004) 116 Cal.App.4th 1224, 1230.) Considering the potential impact of an SVP testifying at his or her commitment hearing, it logically follows that an SVP's testimony could have a direct impact on the SVP's liberty interest, namely the prosecution could use the testimony to prove that he or she should remain committed. Against this backdrop, we determine that strict scrutiny is the proper test to apply to the

30

People's justification of the disparate treatment. (See *People v. Dunley*, *supra*, 247 Cal.App.4th at p. 1453.)

Under the strict scrutiny test, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1335.) Here, the People have offered no justification under the strict scrutiny test to justify the disparate treatment. Thus, following *Curlee*, *supra*, 237 Cal.App.4th at page 722, "[w]e emphasize that, like our high court in *McKee I*, we do not conclude the People cannot meet their burden to show the testimony of an NGI is less necessary than that of an SVP. We merely conclude that they have not yet done so. In our view, the proper remedy is to remand the matter to the trial court to conduct an evidentiary hearing to allow the People to make an appropriate showing."

## DISPOSITION

The matter is remanded to the superior court for further proceedings. On remand, the superior court is directed to conduct an evidentiary hearing at which the People will have the opportunity to show that the differential statutory treatment of SVP's and NGI's

31

is justified. If the trial court determines the People have carried their burden to do so, it shall confirm its order finding Field an SVP and committing him to a mental hospital. If it determines the People have not carried their burden, the superior court shall conduct a new hearing under the SVPA to determine whether Field is an SVP.

 

 

HUFFMAN, J.

WE CONCUR:

 

McCONNELL, P. J.

 

NARES, J.