Filed 10/28/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>MARTIN FIELD<br><br>    Defendant and Respondent. | D081792, D082092<br><br><br>(Super. Ct. No. FELSS903428) |
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>JOHN ASHER,<br><br>    Defendant and Respondent. | (Super. Ct. No. FVAFS020545) |

CONSOLIDATED APPEALS from orders of the Superior Court of San Bernadino County, Lorenzo R. Balderrama, Judge.  Affirmed.

Jason Anderson, District Attorney, and Brent J. Schultze, Deputy District Attorney, for Plaintiff and Appellant.

Rudy Kraft, under appointment by the Court of Appeal, for Defendants and Respondents.

A sexually violent predator (SVP) is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code,[1] § 6600, subd. (a)(1)). If a jury finds that a defendant is an SVP, the defendant shall be committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement in a secure facility that is under the jurisdiction of the Department of Corrections and Rehabilitation. (§ 6604.) Both Martin Field and John Asher (together, Respondents) were found by separate juries to be SVPs and committed indefinitely to a state hospital. Further, they were compelled to testify against themselves during their respective commitment trials.

In separate appeals, both Field and Asher argued, among other issues, that they were similarly situated to people found not guilty of a felony by reason of insanity (NGIs) who also may be involuntarily committed. (See Pen. Code, § 1026.5, subd. (a).) Moreover, because NGIs are not required to testify against themselves at their commitment trials (see *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 832 (*Hudec*)),[2] Respondents maintained that equal protection principles were violated because Respondents did not enjoy

---

[1]  Statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]  Our high court based this right on Penal Code section 1026.5, subdivision (b)(7), which provides NGIs with "the rights guaranteed under the federal and State Constitutions for criminal proceedings." The court explained that under that statute, NGIs "facing a commitment extension hearing enjoy the trial rights constitutionally guaranteed to criminal defendants, which include the right to refuse to testify in the People's case-in-chief." (*Hudec, supra*, 60 Cal.4th at p. 832.)

the same right under the Sexually Violent Predators Act (§ 6600 et seq. (SVPA or the Act)).

In *People v. Field* (2016) 1 Cal.App.5th 174 at page 197, we determined that Field's equal protection argument had merit and remanded the matter back to the superior court to hold an evidentiary hearing. In that hearing, under the strict scrutiny test, the People had the burden of establishing they have a compelling interest that justifies the law and then demonstrating that the distinctions drawn by the law are necessary to further its purpose. (*Ibid.*)

In an unpublished decision, Division Three of the Fourth Appellate District reached the same conclusion and remanded Asher's case back to the superior court for an evidentiary hearing. (See *People v. Asher* (Jan. 22, 2016, G050231) [nonpub. opn.], review denied April 27, 2016, S232532.)

With Field's case serving as the lead matter for the Superior Court of San Bernardino County, which included Asher's case, the trial court held an evidentiary hearing wherein it determined the People had not satisfied their burden. Thus, it concluded that equal protection principles had been violated by requiring Field and Asher to testify during their commitment trials under the SVPA. Separately, the court subsequently ordered new commitment trials for Field and Asher.

The People appeal the new trial orders, arguing the trial court erred in finding that the People had not shown the disparate treatment of SVPs was justified. We disagree and thus affirm the orders.

3

## FACTUAL AND PROCEDURAL BACKGROUND
### Mechanics of SVP Commitment

Before discussing the evidentiary hearing, a brief overview of the subject commitment process will be helpful. "Under the SVPA, the state can civilly commit individuals found to be SVPs after they conclude their prison terms." (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646.) The SVPA is intended " 'to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' " (*People v. McKee* (2010) 47 Cal.4th 1172, 1203 (*McKee I*).)

"Before a petition may be filed under the [SVPA], the inmate must first be screened by the Department of Corrections and Rehabilitation, generally at least six months before his or her scheduled release date. (§ 6601, subd. (a).) This screening is conducted in accordance with a structured screening instrument and is 'based on whether the person has committed a sexually violent predatory offense and on a review of the person's social, criminal, and institutional history.' (*Id.*, subd. (b).) If the Department of Corrections and Rehabilitation determines that the inmate is likely to be an SVP, it refers the matter to the State Department of State Hospitals for a 'full evaluation' regarding whether the inmate meets the criteria in section 6600. (§ 6601, subd. (b).)" (*People v. Superior Court* (*Couthren*) (2019) 41 Cal.App.5th 1001, 1008 (*Couthren*).)

The State Department of State Hospitals then assigns two psychiatrists or psychologists (§ 6601, subd. (d)) to examine the person "in accordance with a standardized assessment protocol which requires an 'assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders.' (§ 6601,

4

subd. (c).).” (*Couthren, supra*, 41 Cal.App.5th at p. 1009.) If two independent professionals concur that the inmate meets the criteria for commitment as an SVP, the director of the State Department of State Hospitals forwards a request that a commitment petition be filed to the county in which the inmate was convicted of the offense for which he or she is currently incarcerated. (§ 6601, subds. (f), (h)(1) & (i).) If designated counsel in that county concurs with the recommendation, he or she then files a commitment petition in superior court. (*Id.*, subd. (i).)

"Once an SVP petition has been filed, '[a] judge of the superior court shall review the petition and shall determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release.' (§ 6602, subd. (a).) The probable cause hearing is not a determination of the merits of the petition. Rather—as in preliminary proceedings under the criminal law—the sole purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the petition. [Citation.] Thus, the trial court at a probable cause hearing under the [SVPA] must determine 'whether a reasonable person *could entertain a strong suspicion* that the petitioner has satisfied all the elements required for a civil commitment as an SVP.' [Citations.] A failure to find probable cause leads to dismissal of the petition. (§ 6602, subd. (a).)" (*Couthren, supra*, 41 Cal.App.5th at p. 1009.)

If, on the other hand, there is a finding of probable cause, the court orders "that the person remain in custody in a secure facility until a trial is completed and shall order that a trial be conducted to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release." (§ 6602, subd. (a).) Either party may

5

demand a jury trial in an SVP commitment proceeding. (§ 6603, subds. (a), (b).) The alleged SVP has the right to the assistance of counsel, to retain experts, and to access relevant psychological and medical reports. (*Id.*, subds. (a) & (j).) The SVPA also contains "provisions for the evaluations to be updated or replaced after the commitment petition is filed in order 'to obtain up-to-date evaluations, in light of the fact that commitment under the SVPA is based on a "current" mental disorder.'" (*People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36, 43.) Further, the Act contemplates that the People could seek an order requiring an individual meet with an evaluator for an updated or replacement evaluation. (See § 6603, subd. (d)(1).)

The People must prove beyond a reasonable doubt that each of the statutory elements under the SVPA has been established (§ 6604), and a jury verdict must be unanimous (§ 6603, subd. (g).) If the court or jury[3] determines that the person is an SVP, the person is "committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement in a secure facility designated by the Director of State Hospitals." (§ 6004.)

After commitment, an SVP is evaluated every year to consider "whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative, pursuant to Section 6608, or an unconditional discharge, pursuant to Section 6605, is in the best interest of the person and conditions can be imposed that would adequately protect the community." (§ 6604.9.)

---

[3] Either party can request a jury trial. (§ 6603, subds. (a), (b).) If neither party requests a jury, the matter will proceed as a bench trial.

Under certain circumstances not relevant here, an SVP may petition the court for either conditional release (§ 6608) or unconditional discharge (§ 6605).

*The Evidentiary Hearing*

Per our direction, the trial court held an evidentiary hearing to determine whether the People could show that the differential statutory treatment of SVPs and NGIs is justified. The hearing was spread over 26 days and included 13 expert witnesses.[4]

The People offered the testimony of 10 witnesses as well as documentary evidence. They provided general background information regarding SVPs and NGIs.[5] In doing so, the People explained how SVPs and NGIs are diagnosed and treated in a hospital. Additionally, the People

---

[4] The People note several evidentiary issues in their opening brief. However, they do not claim the court incorrectly ruled on any evidentiary issue. Moreover, neither the People nor Respondents are challenging the admission of evidence at the hearing. Thus, we do not discuss the evidentiary issues further.

[5] The People also provided evidence regarding committees under the Mentally Disordered Offenders Act (Pen. Code, § 2960 et seq. (MDOA)) and the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.). Committees under both those acts have been determined to be similarly situated to NGIs regarding the testimonial privilege provided for in Penal Code section 1026.5, subdivision (b)(7). (See *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1106–1107 [LPS Act committees]; *People v. Dunley* (2016) 247 Cal.App.4th 1438, 1443 [MDOA committees].) However, for convenience and clarity, we do not discuss the specific evidence the People offered regarding committees under the MDOA or LPS Act for two reasons. First, no court has determined whether equal protection principles are violated by requiring either type of committee to testify at his or her own commitment trial. Second, the People group committees under the MDOA and LPS Act with NGIs in terms of symptoms and treatment with minor differences that are not pertinent here. Alternatively stated, the People do not offer any unique arguments as to MDOA or LPS Act committees bearing on the issues before us.

proffered evidence regarding why an SVP's testimony would be more necessary than the testimony of an NGI at a commitment trial.

Field called four witnesses, one of whom had been called by the People. Like the People's witnesses, the defense witnesses provided background and treatment information regarding SVPs and NGIs. In addition, some of the witnesses testified regarding why the testimony of an SVP was not necessary at a commitment trial.

*Background on SVPs and NGIs*

SVPs are overwhelmingly diagnosed with paraphilic disorders—disorders of sexual attraction. Sexual crimes can be very strong indicators of a paraphilic disorder. Pedophilia is the most common paraphilia among sexually violent predators, followed by coercive disorders. A common secondary diagnosis is an antisocial personality disorder.

A psychological trigger can produce symptoms of paraphilia, such as sexual arousal. For pedophiles, triggers can include children of a certain gender and age range. Even if the trigger itself is not inherently sexual, such as hair color, it may still be related to sexual behavior or offending. The symptoms of the trigger may not be observable.

Paraphilias are typically persistent, consisting of lifelong symptoms. Generally, significant intervention is needed to change the course of the disorders. Management of a paraphilia is aided when the individual is honest about the frequency and intensity of his or her sexual arousal. Journals kept by sex offenders can be useful in this regard, to help understand what triggers paraphilic symptoms and the response to such triggers. Discussing such things in a therapy group or with a health care provider can also prove helpful. Similarly, such information assists treatment staff as they gain insight and can aid in evaluating the sex

8

offender.  Reports evaluating whether someone is an SVP generally only include his or her subjective psychological experience if it has been reported to treatment providers and documented; for individuals not in treatment, such self-reported symptoms are rare.

Even in a highly controlled environment, such as a state hospital, remission of a paraphilia is highly unlikely.  Yet, symptoms of the disorder (e.g., strong paraphilic urges) may not present themselves in such a controlled environment.  Psychological triggers, such as children in the case of pedophiles, are less common or absent in state hospitals.  It is more difficult for an SVP to commit new offenses or use pornography while in a state hospital.

Treatment plans for SVPs are developed by interdisciplinary clinical team members.  Depending on the offender, different areas can be focused on, such as psychiatric issues, dangerousness, substance abuse, spiritual issues, and general health.

Cognitive behavioral therapy targets the relationship between emotions, thoughts, and behaviors.  For SVPs, risk factors, such as sex impulsivity and lack of problem-solving skills, are addressed.

At Coalinga State Hospital, where SVPs are committed in California, the Sex Offender Treatment Program (SOTP) consists of four modules.  The first module involves educating sex offenders about the treatment program and obtaining informed consent for treatment.  The second module is primarily focused on developing insight into the sexual offense process and managing risk factors.  Most patients are placed in this module because it involves active treatment.  The third module focuses on managing risk factors in the community.  This module requires written assignments but includes activities to help deal with family and develop a support network.

9

The fourth module is designed to maintain a connection to the skills learned in previous modules as the offender prepares for release.

An SVP is not automatically enrolled in SOTP. Rather, he or she must affirmatively elect to participate. Less than half of SVPs participate in SOTP treatment.

Psychotherapeutic groups are generally comprised of six to nine patients and usually will have two facilitators, including a psychologist or social worker. Such groups are focused on the group's mental health problems and involve individual sex offenders discussing past offenses, as well as deviant thoughts and behaviors, both past and present. Such statements during group sessions are noted in state hospital records.

Individual, one-on-one therapy may be needed for sensitive topics, like past trauma, or other treatment barriers before a sex offender can meaningfully participate in group therapy. It can, but does not necessarily include discussion of past offenses or deviant thoughts and behaviors. Again, statements made during individual therapy are noted in state hospital records.

There are some instruments that are used in the treatment of SVPs. For example, the penile plethysmograph is an instrument that measures circumferential changes to a penis when a man is exposed to stimuli. It is usually administered at least twice to SVPs in the state hospitals. It acts as a treatment validation measure; if a sex offender reports experiencing no arousal from certain stimuli, the penile plethysmograph can be used to determine if that is true. It can be used in conjunction with a polygraph. Polygraphs can be useful to validate what a sex offender reports in treatment.

Many SVPs are aware of the legal issues surrounding their cases. They tend to know relevant cases, such as *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), governing hearsay and are generally perceptive of the implications for their commitment trials. In some cases, their behavior in the hospital is driven by legal strategy, focusing on regaining their freedom rather than treating their paraphilias.

Some SVPs coordinate with one another to avoid treatment and discussion with state hospital staff, which can result in pressure on other offenders not to engage in treatment as well.

A forensic interview of an SVP is conducted by an evaluator who must write a report, which takes specific legal criteria into account. It is directly related to the mental illness that is relevant to an SVP's commitment.

The forensic interview is designed to provide information for the report, which will convey the evaluator's opinion at trial. This includes the interviewee's statements about his or her past offenses and the thoughts and behaviors that are associated with offending. It also contains the interviewee's perception of his or her current sexual interests and how he or she is managing deviant interests.

Without interviews, the evaluator must rely on historical information, which may be outdated. When SVPs refuse to be interviewed, it can lead to difficulty making a diagnosis. However, evaluators can use historical information, past statements, and other available records to come to a diagnosis. And the Diagnostic and Statistical Manual of Mental Disorders (DSM) permits a paraphilia diagnosis without an interview.

In contrast to SVPs, NGIs are overwhelmingly diagnosed with psychotic and mood disorders, including schizophrenia and bipolar disorder. Psychotic symptoms are readily apparent to even the untrained observer:

11

responding to hallucinations, arguing with someone who is not there, expressing delusional beliefs, poor hygiene, depression, and in extreme cases, catatonia. Symptoms can be triggered by a wide variety of things, some of which may be present in state hospitals. Psychotic disorders can be treated with antipsychotic medication.

NGIs are more likely to participate in treatment and to engage in interviews with medical staff than SVPs. NGIs also do not tend to object to the release of their records for purposes of their commitment trials.

*The Importance of SVPs Testifying at a Commitment Trial*

Regarding the importance of SVPs testifying in a commitment trial, the People offered the testimony of Dr. Sharon Kelley, Dr. Harry Goldberg, Dr. Anita Schlank, Dr. Clark Clipson, Dr. Charles Flinton, and Dr. Anna Salter.

Dr. Kelley is s a licensed psychologist who works at the Sand Ridge Secure Treatment Center in Mauston, Wisconsin, treating SVPs. She previously worked as the director of the Specialized Assessment Center at Coalinga State Hospital. According to Dr. Kelley, the need for an SVP to testify at his or her commitment trial stems from the differences between SVPs on one hand and NGIs on the other, specifically how they seek treatment, their willingness to participate in treatment, and how they manifest their conditions. For example, SVPs predominantly have a paraphilia as their primary diagnosis, with pedophilia being the most common. In contrast, NGIs usually have a psychotic spectrum disorder, most commonly schizophrenia or schizoaffective disorder. For the latter group, their symptoms are readily apparent and can be well documented, even in a secure hospital setting, where psychological triggers are more likely to be

12

present. Negative symptoms, such as lack of hygiene skills, generally apply only to individuals with psychotic spectrum disorders, not paraphilias.

For SVPs, symptoms are not as obvious and can be masked by a patient. Psychological triggers are limited and therefore dynamic risk factors are not tested in a hospital setting. Moreover, recent levels of documentation are low—monthly reports can be a couple sentences, and unit notes might be sparse.

Dr. Kelley emphasized that when deciding whether to commit someone to a state hospital, a jury needs to understand whether that person has a mental disorder, as well as any connection between that mental disorder and the person's dangerousness. Juries rely on experts to help them answer these questions. If those experts have limited information, like in the case of SVPs who often do not participate in treatment while in a hospital, and they do not have easily discernable symptoms, then the jury will need to get information from elsewhere. Accordingly, the testimony of SVPs becomes more necessary at trial.

Dr. Kelley also noted that the organized efforts among some SVPs to avoid treatment and dissuade others from going to treatment makes the testimony of SVPs more necessary at trial. In this sense, their testimony fills information gaps created by such noncompliance campaigns. In addition, SVPs tend to be more legally savvy than NGIs. They refuse to agree to the release of their records about half of the time while other psychiatric patients will generally agree to release records 90 percent of the time. This lack of records makes the testimony of an SVP more necessary at trial. Dr. Kelley testified that an SVP's refusal to participate in interviews causes problems when it comes to evidentiary rules concerning hearsay.

Dr. Kelley also pointed out that the primary treatment for SVPs is cognitive behavioral therapy. In contrast, the primary treatment for NGIs is psychotropic medication. Whether medication has been effective is something that can be observed and does not require the offender to testify. In contrast, it is difficult to say whether cognitive behavioral therapy has had any effect if the patient refuses to sit for an interview.

Additionally, Dr. Kelley testified that participating in treatment and correctly evaluating its efficacy is key to making appropriate decisions about discharging or retaining patients. If someone will not participate in treatment or be interviewed, then relevant information needs to be put before the jury another way.

Dr. Goldberg is a licensed psychologist who had evaluated thousands of SVPs, NGIs, and potential NGIs in California and Washington.[6] He largely echoed Dr. Kelley's testimony and opinions regarding the usefulness of SVPs testifying at commitment trials. He had experience with compelled testimony of SVPs in Washington and found it was helpful.

Dr. Goldberg emphasized that no medication can rid someone of a paraphilia. So, a paraphilia is lifelong and chronic. Most SVPs do not receive psychiatric services in the prison setting. And, in evaluating an SVP, one must consider essential bits of data that are necessary to gauge progress versus lack of progress in dealing with paraphilia. The only way to accomplish that task, according to Dr. Goldberg, is to hear the offender speak. Dr. Goldberg also noted that SVPs tend to be more sophisticated and will conceal harmful facts, which is part of the reason why many of them do not participate in treatment.

---

[6] Dr. Goldberg also evaluated committees under the MDOA.

Dr. Goldberg opined that dynamic risk factors related to the risk of recidivism can change over time, but the only way to assess the current state of such factors is by speaking with the SVP, either in an interview (which can be refused) or through courtroom testimony.

In contrast, Dr. Goldberg testified that it is not that important to get testimony from NGIs because it is obvious when they are in remission. In short, data is more accessible for NGIs compared to SVPs. Further, even a lay person can usually detect when NGIs are experiencing symptoms.

Dr. Schlank is a board-certified forensic psychologist who had recently retired from her position as clinical director of the Virginia Center for Behavioral Rehabilitation and had previously worked at inpatient and outpatient mental health facilities in Minnesota. She has authored or coauthored several publications about sex offenders. She was on the editorial boards of the *Journal of Forensic Psychology* and the *Sex Offender Law Report*. She was a consultant on civil commitment programs in 11 states, including California.

In Dr. Schlank's opinion, the testimony of an SVP was more necessary than the testimony of an NGI. She noted that some people who had suffered from psychosis could not remember much from when they were actively suffering from it. Thus, the observations of others, such as staff, could be more helpful than the patient's testimony.

SVPs are primarily diagnosed with paraphilias and may have comorbid antisocial personality disorders. In commitment proceedings, it is often more important to hear from the sex offender than treatment providers, due to a lack of participation in treatment. Their answers to questions can reveal their beliefs and help others understand their thinking.

15

Dr. Schlank testified that even untruthful testimony could be useful, revealing cognitive distortions of SVPs.[7] She acknowledged that a sex offender's failure to seek treatment could be used against him or her while participating in treatment could lead to the revelation of harmful information. But Dr. Schlank cautioned that refusing to participate in an interview could also lead to people being committed as SVPs when they should not be.

Dr. Clipson is a licensed psychologist whose private practice was devoted to conducting psychological and neuropsychological evaluations; he has provided training to defense attorneys and the courts. Dr. Clipson opined that the testimony of an SVP is more necessary than an NGI's testimony.

He explained that evaluating SVPs required different skills or tools than evaluating other civil commitment types. Although evaluating NGIs may be like evaluating SVPs in the sense that they all require an ability to apply understanding of diagnoses and treatment to address legal questions, sex offenders require a specialized type of assessment with unique assessment methods.

Dr. Clipson provided four reasons why testimony from an SVP was more necessary than testimony from an NGI. First, NGIs tend to have psychotic and mood disorders. In contrast, SVPs usually suffer from paraphilias and personality disorders. The symptoms of the first group are readily apparent: hearing voices, responding to internal stimuli, bizarre speech and behavior, delusional beliefs, depression, lethargy, and disorganization. Such symptoms are typically a source of pain for the individual. However, an SVP's symptoms are more difficult to observe; in the

---

[7] Dr. Schlank opined that most SVPs have cognitive distortions, such as believing that sex between children and adults is fine, and their views will be widely accepted soon.

16

absence of an object of sexual interest, there may be no evidence of their disorder.

Second, people with psychotic disorders can improve, diminish over time, and even be stable on medication.  The improvement is quite evident. In comparison, paraphilia appears to be a lifelong condition, even if it fluctuates with age.  Unless the sex offender discusses his or her experience, an observer may not be aware of any changes.

Third, people with psychotic disorders tend to want help for their problems and understand that mental health professionals can help them get better.  Medication can help reduce paranoia and lead to a therapeutic alliance between the patient and treating doctor.  Sex offenders, on the other hand, are aware that their crimes are stigmatized by society.  They have generally been concealing their crimes in prison, for fear of repercussions. They tend to be more manipulative and deceptive and often conspire to avoid treatment in the state hospitals.

Fourth, the sex offender's own attitude toward testifying can be important.  Some understand that they have a disorder and can articulate a relapse prevention plan with important details to avoid offending again. That said, other sex offenders are comfortable with their impulses, and Dr. Clipson believed that a jury could tell the difference.

Overall, Dr. Clipson opined testimony from someone with a psychotic disorder is less useful because the witness's presentation during testimony will not necessarily reflect how he or she has been doing in the preceding months.

Dr. Flinton is a psychologist who founded the San Francisco Forensic Institute, which provides services to sex offenders.  For many of the same

reasons as stated by Drs. Kelley, Goldberg, Schlank, and Clipson, he opined that the testimony of SVPs was more necessary than that of NGIs.

Dr. Flinton also testified that the dangerousness analysis is different for SVPs versus the other types of committees. For offenders with psychotic disorders, the dangerousness analysis is more complex and convoluted. With a sex offender, the dangerousness analysis is specific: the likelihood of committing future violent sex offenses. Thus, Dr. Flinton explained that the sex offender's testimony in front of a jury can show how the offender has changed and what he or she is doing to prevent himself or herself from committing more offenses. Dr. Flinton believed that the jury needs to understand the dynamics of paraphilic disorders, including the pattern of behavior, stimuli, and the episodic nature of the paraphilia. An SVP's testimony can reveal his or her ability or inability to control his or her behavior, highlighting the progress, or lack thereof, the offender has made in treatment.

According to Dr. Flinton, when a psychotic patient attempts to pretend that they are not experiencing psychotic symptoms, there may be physical clues showing otherwise: facial expressions, body movements, high levels of alertness or vigilance, or simply looking around can signal that hallucinations or paranoia are present. Such a patient might not remember episodes where they caused harm to others. Or, they may remember, but their recollection is distorted and does not reflect reality. The lack of insight among such patients is notable. Most NGIs do not have the same level of functioning as SVPs.

SVPs, in comparison, are better able to mask their underlying disorder. An interview is necessary to dig deeper and find their underlying motivations. But even if an SVP has consented to be interviewed, testimony

18

before a jury can be useful to provide validation for the expert's observations or to show the jury that the SVP is resistant or deceptive. This can help the jury assess whether someone can be safely managed in the community. Testimony can also illuminate an SVP's comorbidities, such as antisocial personality disorder, and help the jury understand how that affects the SVP's sexual offenses.

Despite Dr. Flinton's opinion regarding the need to have SVPs testify at their commitment trials, he stated that sexual deviance can be tested by physiological testing or a history of sex offenses; admissions by the sex offender are not required.

Dr. Salter is a psychologist who published three books related to sex offenders and provided education and training in the field. She interviewed sex offenders for certain educational films. Dr. Salter primarily testified in SVP cases in Iowa, where compelled testimony is permitted. She observed such testimony to yield additional sources of information and provide useful material in the process. She testified that there exist two main factors that lead to sexual offending: deviant sexuality and antisocial attitudes and beliefs.

In addition to largely echoing what the previous witnesses said regarding the importance of SVP testimony, Dr. Salter explained that when assessing risk that an SVP could reoffend, dynamic variables, such as attitudes, beliefs, admissions, callousness, remorse, and empathy can change over time, and therefore cannot be found in criminal records.

According to Dr. Salter, some dynamic variables have empirical support for assessing risk. Such variables include sexual preoccupation, attitudes that minimize the harm to victims, emotional congruence with children (where offenders socialize with children and feel more comfortable around

19

them than adults), impulsiveness, problems with self-regulation (such as being unable to hold down a job), poor problem-solving skills, resistance to rules and regulations, grievance and hostility, negative social influences, Machiavellianism, callousness, and sexualized coping. Although testimony is not guaranteed to elicit evidence on each variable every time, it can shed light on one or more of the dynamic variables.

Another relevant variable is psychopathy, which can be shown by grandiosity, superficial charm, conning, and manipulation. Dr. Salter lamented that such attributes rarely show up in prison records. She further testified that records are generally insufficient for evaluating the risk an SVP may pose. For example, recordkeeping can differ dramatically and sufficient records may not have been kept. As an SVP may have committed sex crimes going back decades, getting older records may be difficult, or the information recorded may be limited. When institutions have poor recordkeeping, the importance of the sex offender's testimony increases.

Where an SVP has refused to be interviewed, Dr. Salter believed the importance of testimony increases as well. Dr. Salter also emphasized the differences between interviewing an SVP in a hospital and compelling the SVP's testimony at trial. Even when an SVP consents to an interview, the evaluator's attempts to build rapport may result in a failure to identify some of the offender's dynamic risk factors. Further, the offender can end the interview at any point or refuse to answer certain questions. However, testifying in court is a different matter because attorneys do not need to maintain rapport with the offender. And the stress of court can bring out impulsiveness and make it harder to engage in manipulative tactics. Moreover, when an SVP is evasive, lies, or refuses to answer certain questions at trial, it can speak to dynamic risk factors, based on the reason

for the evasion. Also, for antisocial offenders, the courtroom environment can highlight their antisocial tendencies.

The defense called Dr. Douglas Korpi and Dr. Amy Phenix to address the need, or lack thereof, for SVP testimony at a commitment trial.

Dr. Korpi is a licensed psychologist who has performed between 1,300 and 1,400 SVP evaluations, most of which were initial evaluations. Dr. Korpi did not offer an opinion regarding whether it would be "necessary or even beneficial" for a jury to hear an SVP testify during a commitment trial. However, among other things, he testified that it was not essential that he interview a sexual offender before preparing an initial evaluation of that individual. Although he finds it best to interview an SVP, he always relies on the packet of information to inform his evaluations, which usually consists of police reports, rap sheets, and probation reports.

When conducting an update on an SVP to help evaluate whether the offender should remain hospitalized, Dr. Korpi admitted that sometimes the record is robust, but other times, it is "relatively meager." The thoroughness of the record depends on whether the SVP is in treatment and how the related documents are kept (sometimes treatment notes are not kept in the offender's chart but are stored elsewhere). Dr. Korpi noted that the "very regimented" way in which records must be requested can make it more difficult to obtain all available information.

The defense also called Dr. Phenix, who is a psychologist focusing exclusively on SVP evaluations, mostly in states other than California. However, in 1996, she helped develop the protocol for evaluating SVPs in California. In that role, she was responsible for training and hiring evaluators of SVPs as well as evaluating those evaluators.

21

Dr. Phenix opined that it was not "necessary for [an SVP] to testify in front of the trier of fact for those people to make an informed decision about the risk of the [SVP]." She offered four reasons to support her opinion.

First, Dr. Phenix noted that the trier of fact is not "informed or educated about various diagnoses and why they're offered and what they mean." She also expressed skepticism that an SVP would want to discuss his or her desires to commit sex crimes or offer other useful information while testifying. Dr. Phenix explained that she did not believe it was necessary to interview an individual to determine whether he or she was an SVP. Rather, she usually evaluated the person based on the individual's history and the applicable records. She testified that she "always had enough records to make a determination" in California whether an individual qualified as an SVP. That said, Dr. Phenix admitted that sometimes an interview with a potential SVP could be important, but she usually did not ascertain whether an individual was an SVP based on an interview.

Second, Dr. Phenix indicated that she did not believe testimony from an SVP was necessary to reveal secondary diagnoses such as antisocial behavior. She testified that a person's antisocial behavior could "generally [be] see[n] from the person's records." Dr. Phenix observed that she had never changed her diagnoses of an antisocial personality disorder based on what she heard a person say in court.

Third, Dr. Phenix opined that an SVP's testimony is not necessary to clarify dynamic risk factors. She further explained that she did not have any difficulty measuring dynamic risk factors using the available records. She used dynamic risk factors to add new information to the static actuarial tools:

22

the Static-99[8] and Static-2002R.[9] Although she agreed with Dr. Salter that multiple-source evaluations are the "gold standard" for evaluation, she disagreed with the statement that dynamic risk factors cannot be found in criminal records. In discussing risk factors, Dr. Phenix made clear that she did not think an SVP's testimony would be helpful to the jury. To this end, she illuminated:

> "No. I don't think that the jury has the experience to identify risk factors that are important and other relevant information to diagnoses and risk assessments. I don't think they're skilled in that. So you have an expert that's able to articulate that."

Fourth, Dr. Phenix testified that it would be "[h]elpful, but not necessary" for an SVP to testify at trial for a jury to access treatment participation or progress. She noted that it would be more effective for an expert to talk to the individual and then convey his or her thoughts to the jury. Further, Dr. Phenix explained that whether an SVP engaged in treatment voluntarily would be evident from the file, and any treatment records would usually provide information regarding what progress the SVP had made. And if an SVP refused to participate in treatment, records

---

[8] "The Static–99 test is an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on historical (static) factors such as age, marital status, the number of prior offenses, the relationship of the offender to the victims and the gender of the victims. After identifying the particular characteristics of the offender, the Static–99 test assigns a numeric score to them. The total score of the test is a percentage chance of the defendant's likelihood of being convicted for a future sexual offense." (*People v. Therrian* (2003) 113 Cal.App.4th 609, 612.)

[9] Like the Static-99, the Static-2002R is a risk assessment tool, often used to evaluate the likelihood of a defendant committing a future sexual offense.

23

sometimes would allow an expert to determine whether an individual still meets the criteria of an SVP.

Dr. Phenix also agreed with her previous opinion that, "It's possible to respond definitively to the SVP criteria based on a thorough review of the files and appropriate contacts with collateral sources. While court testimony might prove helpful, it is not necessary, in my expert opinion."

Finally, Dr. Phenix testified that she did not think it was "fair" that an SVP who denies meeting the criteria for commitment could be forced to take the stand and answer questions.

*The Trial Court's Ruling*

After the close of testimony at the evidentiary hearing, the court made several detailed observations regarding the People's argument "that overall the testimony of the SVP is more necessary than the testimony of other civil commitments." In doing so, the court discussed the evidence presented and made specific findings. For example, the trial court noted:

> "Several witnesses for the People have opined that with the SVPs not participating in the forensic interview, the only way for the trier of fact to learn about the SVP's diagnosed mental disorder, his ability to manage, and likelihood that he would engage in sexually violent criminal predatory behavior as a result of it is for the D.A. to call the SVP in the trial. The D.A.'s experts believed that the only way to get a window into the SVP[']s mind is through compelled testimony, so that the trier of fact can make the best decision on whether or not the Respondent meets SVP criteria.

> "This argument and others play into the People's general theme that, because there is a great paucity or lack of information regarding the potential SVP[']s paraphilic disorders, the compelled testimony of the SVP is more necessary than that of the other civil commitments. Dr. Kell[e]y, who practices in Wisconsin where a potential SVP cannot be called to testify, noted that in Wisconsin the

24

State has a huge amount of records, all probation reports, police reports and evaluations. She noted that there is so much available information, it doesn't make sense to force the potential SVP to testify . . . .

"The fact is that in California, the prosecution, defense, and the Court have the same voluminous amounts of records to gather information about the SVP's paraphilic diagnosed mental disorder as well. . . ."

The trial court assessed the value of an SVP's testimony, especially considering the evidence the People offered that such sexual offenders generally are deceptive and manipulative while minimizing their crimes. The court weighed the necessity of an SVP's testimony in this context while "considering all the other voluminous information . . . regarding [SVPs]." In considering this question, the court noted that the DSM does not require a forensic interview for a diagnosis of paraphilia, that a forensic interview is not required for an evaluator to score a patient on the Static-99 or to determine risk factors, and that a forensic interview is not a prerequisite for an evaluator to determine if an individual meets SVP criteria.

After considering the "substantial liberty interest" at issue, the other "fundamental Constitutional rights that adhere to an SVP trial," and the impact of involuntary commitment caselaw, the court then returned to addressing the records that are available in SVP cases and the need for an SVP's testimony at a commitment trial:

"The amount of evidence from police reports, probation reports, transcripts, CDCR and DSH records, and evaluations are truly voluminous in these kinds of cases. Usually the sheer heinousness of the sexual offenses committed by the potential SVPs tend to disturb and convince the trier of fact by themselves that the SVP meets criteria. Compelled testimony may provide some trial accuracy, but when the State seeks to commit an individual for an indefinite and potential life term, the State should

25

> carry the load as it has the burden of proof beyond a reasonable doubt."

The court later concluded:

> "As it stands, the Court does not believe the D.A. has delineated a nexus between the evidence and requirement of compelled testimony along with other Constitutional considerations. The Court, therefore, will not make the findings requested by the D.A., although the evidence presented is, of course, available to the Court of Appeal.
>
> "The Court, therefore, respectfully denies the People's motion[.]"

The court subsequently issued orders granting a new trial for each respondent.

The People filed a timely notice of appeal.

## DISCUSSION

### A. Appealability

On December 19, 2022, the trial court ruled that the People did not satisfy their burden to justify the disparate treatment of SVPs. A few weeks later, on January 5, 2023, the trial court issued separate orders for a new trial, per section 6604, for Field and Asher. The People filed a notice of appeal, asserting the court's orders granting new trials were appealable under Code of Civil Procedure section 904.1, subdivision (a)(4) and Penal Code section 1238, subdivision (a)(3).[10]

Field, but not Asher, filed a motion to dismiss this appeal. First, he argues Penal Code section 1238, subdivision (a)(3) does not apply because this matter is not a criminal case. Second, Field insists that Code of Civil

---

10    Both these statutes allow an appeal to be taken from an order granting a new trial. (See Pen. Code, § 1238, subd. (a)(3); Code Civ. Proc., § 904.1, subd. (a)(4).)

26

Procedure section 904.1, subdivision (a)(4) is not applicable because the trial court's new trial order was "unnecessary since the new hearing was required by this court once the trial court found that the [People] had not sustained [their] burden to prove that Field's equal protection rights would not be violated by compelling him to testify at his SVP trial." (See *People v. Field*, *supra*, 1 Cal.App.5th at p. 197.)

We disagree that the trial court's order was unnecessary. In our disposition in *People v. Field*, we remanded the matter back to the superior court to conduct an evidentiary hearing. Depending on the result of that hearing, we instructed the court to proceed in one of two ways. If the court determined the People carried their burden to show that differential treatment of SVPs and NGIs was justified, then the court was to confirm its order finding Field an SVP and committing him to a mental hospital. However, if the court found that the People failed to satisfy their burden then the court was to hold a new hearing under the SVPA to determine whether Field is an SVP. (*People v. Field*, *supra*, 1 Cal.App.5th at p. 197.) And because an SVP is entitled to a jury trial as to the civil commitment issue (see § 6603, subd. (a)), we see nothing improper with the trial court ordering a new trial consistent with our disposition in *People v. Field,* as a trial court has the inherent authority to manage the litigation before it. The new trial order the trial court issued is clearly appealable. (See Code Civ. Proc., § 904.1, subd. (a)(4).)

Further, even if we were persuaded that the trial court's new trial order was somehow unnecessary and unappealable, we would nonetheless address the merits of the appeal here by treating the opening brief as a petition for a writ of extraordinary relief. (See *H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1366–1367.) Indeed, it would be a

27

colossal waste of judicial resources not to do so. This matter has been fully briefed, one of the respondents is not moving to dismiss the appeal, and, in San Bernardino County, this is the lead case for litigating the issue of whether equal protection principles are violated by compelling a defendant to testify in a commitment trial under the SVPA. Thus, we can address the equal protection issue to provide guidance for the San Bernardino County Superior Court on this seminal case. Otherwise, we run the risk of an onslaught of appeals following commitment trials under the SVPA where the trial court does not permit the People to call the defendant and then the People claim error on those grounds for each of those trials. By addressing the issues raised in this appeal now, we can provide helpful direction to the trial court while serving the goals of judicial economy and efficiency. (Cf. *People v. Djekich* (1991) 229 Cal.App.3d 1213, 1219 ["[W]e elect to treat this matter as a writ of habeas corpus as a matter of judicial economy and efficiency."].)

B. Standard of Review and Related Legal Principles

In *People v. Field*, we followed *People v. Curlee* (2015) 237 Cal.App.4th 709 (*Curlee*) and concluded that SVPs and NGIs were similarly situated for purposes of the statutory privilege not to testify at commitment trials. (*People v. Field, supra,* 1 Cal.App.5th at pp. 193–194.) Moreover, we determined that strict scrutiny was the proper test for the trial court to apply to the People's justification of the disparate treatment of SVPs. (*Id.* at p. 196.) Our Division Three colleagues reached the same conclusions in Asher's case. (See *People v. Asher, supra*, G050231.) On remand, the court evaluated the People's evidence through the strict scrutiny lens and found it wanting.

28

Despite acknowledging that the trial court applied the very test Division Three and this court instructed it to use, the People now ask us to reconsider the issue and find that a rational basis test is more appropriate. We decline to do so. The People have not offered any compelling reason to revisit our analysis in *People v. Field* on this issue. (See *People v. Field, supra*, 1 Cal.App.5th at pp. 194–196.) Thus, strict scrutiny remains the applicable test to apply to the People's justification that SVPs should be compelled to testify in their commitment trials.

We also note that the parties disagree regarding what standard of review should be applied in this case. The People argue that the issue to be determined in the instant matter is a mixed question of law and fact, but because the resolution of that issue is primarily legal, we should apply a de novo standard of review. (See *People v. McKee* (2012) 207 Cal.App.4th 1325, 1338 (*McKee II*).)

In comparison, Respondents do not advocate for a specific standard of review. Yet, they point out that the questions addressed by the trial court during the evidentiary hearing "were primar[ily] factual." Moreover, they emphasize that the trial court resolved factual issues, including evaluating the credibility of witnesses and determining the reliability of evidence. Accordingly, Respondents assert that, even if we apply a de novo review standard, we must accept the factual findings of the trial court if they are supported by substantial evidence.

In their reply brief, the People take issue with Respondents' assertion that the trial court's factual findings are entitled to deference. Instead, relying on *McKee II*, they claim that we independently evaluate the evidence to determine whether the People presented "substantial evidence to support

29

legislative choices"—here, that NGIs cannot be compelled to testify during their commitment trials while SVPs can.

In their reliance on *McKee II*, the People do not appear to appreciate the differences between *McKee II* and the instant matter. Yet, to best explain those differences, we must briefly discuss *McKee I, supra,* 47 Cal.4th 1172. There, our high court concluded that committees under the MDOA and SVPs were similarly situated for purposes of equal protection analysis regarding the length of their commitment and the burden to prove release. (*Id.* at pp. 1202–1203.) The case was remanded to the trial court to determine whether the People could demonstrate "the constitutional justification" (*id.* at p. 1208) for the indefinite commitment provisions of the SVPA and imposing on SVPs a greater burden than is imposed on MDOA committees to obtain release from commitment (*id.* at pp. 1208–1209).

On remand, the trial court held an evidentiary hearing and then issued a statement of decision finding the People had established, by a preponderance of the evidence, that disparate treatment of SVPs "under the Act was based on a reasonable perception of the greater and unique dangers they pose compared to" MDOA committees. (*McKee II, supra*, 207 Cal.App.4th at p. 1332.) On appeal, we affirmed the court's decision, concluding, "like the trial court," that "the disparate treatment of [SVPs] under the Act is reasonable and factually based on and was adequately justified by the People at the evidentiary hearing on remand." (*McKee II*, at p. 1348.) We thus determined that the SVPA did not violate the appellant's equal protection rights in terms of the length of civil commitment and the burden on the SVP to obtain his freedom. Moreover, we did so applying a de novo standard of review. (*Id.* at p. 1338.)

In *McKee II*, we determined that the issues before us were "predominately legal, if not purely legal questions" and noted that the trial court "presumedly did not decide any disputed historical facts, but determined only whether the People presented sufficient evidence to support a reasonable perception that [SVPs] pose a greater danger to society." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.) We further buttressed our conclusion that an independent standard of review was appropriate because "the trial court's statement of decision did not make any express findings regarding disputed historical facts or the credibility of certain witnesses." (*Id.* at p. 1338, fn. 3.) Thus, we found that we were in as good of a position as the trial court to decide whether the evidence presented by the People satisfied their burden. (*Ibid.*)

Here, the record before us does not present the pure legal issues that we found to predominate in *McKee II*. Instead, the trial court in the instant matter explicitly and implicitly made credibility determinations and weighed conflicting evidence. For example, below, a contested historical fact was whether sufficient records (institutional records, treatment notes, interview notes, records of conviction, rap sheets, and the like) existed to allow evaluators to adequately evaluate sexual offenders for purposes of an SVP commitment trial. The court resolved that dispute by finding "the prosecution, defense, and the Court have . . . voluminous amounts of records to gather information about the SVP's paraphilic diagnosed mental disorder[.]" This finding is significant. As we discuss *post*, one of the underlying reasons that the People argued that an SVP should be compelled to testify was based on a lack of available information for experts to evaluate the sexual offender to determine whether he or she should be involuntarily committed under the SVPA. And there were other factual disputes that we

31

shall discuss that the trial court resolved by weighing evidence and evaluating credibility. Thus, unlike our consideration of the record in *McKee II*, we do not conclude here that we are in as good of a position as the trial court to decide whether the People's evidence at the evidentiary hearing satisfied their burden to justify disparate treatment of SVPs under the Act.

A second key difference between the instant matter and *McKee II* is the resolution of the evidentiary hearing. In *McKee II*, the trial court determined that the People satisfied their burden. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1330.) Here, the court found that the People did not carry their burden.

Typically, when the trier of fact determines that a party has not satisfied its burden, that party is not entitled to a "do over" on appeal where the appellate court looks at all the evidence and arguments anew and substitutes its judgment for that of the fact finder below. Rather, a party challenging a determination that it did not satisfy its burden of proof faces a much more arduous undertaking. " 'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and

weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465–466.)  Expressed more tersely, "when an appellant challenges a trial court's conclusion that the appellant failed to carry its burden of proof at trial, 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Vieira Enterprises, Inc. v. McCoy* (2017) 8 Cal.App.5th 1057, 1074 (*Vieira*).)  "This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing [party] to meet, because unless the trier of fact made specific factual findings in favor of the losing [party], we presume the trier of fact concluded that '[the party's] evidence lacks sufficient weight and credibility to carry the burden of proof.' " (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651 (*Estes*), citing *Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164 and *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) "For this reason, ' "[w]here . . . the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor.  That is because unless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [party's] evidence lacks sufficient weight and credibility to carry the burden of proof.  [Citations.]  We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." ' [Citation.]  'The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment.  [Citation.]  " 'All conflicts, therefore, must be resolved in favor of the respondent.' [Citation.]"

33

[Citation.]' [Citation.]" (*Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067.)

We are mindful that the answer to a constitutional question often involves mixed questions of law and fact that are predominately legal, if not purely legal questions. (See *McKee II*, *supra*, 207 Cal.App.4th at p. 1338.) But this is not that typical case. Thus, to any purely legal issue presented, we shall apply the appropriate independent standard. However, to the extent that the People's argument requires us to reach the opposite conclusion of the trial court's factual finding of a disputed fact, the People must show that their evidence compels a finding in their favor as a matter of law. (Cf. *Vieira*, *supra*, 8 Cal.App.5th at p. 1074.) Nonetheless, even if the People are not successful in that endeavor, we still will independently apply the applicable law to the trial court's factual findings.

Finally, the parties disagree regarding the People's burden under strict scrutiny. The People maintain they had to show that the testimony of an SVP is more necessary at the commitment trial than that of an NGI. In contrast, Respondents contend that the People had to prove that an SVP's testimony was necessary, meaning essential or indispensable. The People respond that Respondents' asserted burden "is all but impossible to meet and not justified under the caselaw."

The People take their "more necessary" standard from *Curlee*, *supra*, 237 Cal.App.4th 709 and *People v. Field*, *supra*, 1 Cal.App.5th 174. In *Curlee*, the court stated that it was the People's burden "to show the testimony of an NGI is less necessary than that of an SVP." (*Curlee*, at p. 722.) We quoted the *Curlee* court's language in *People v. Field*, at page 197. And both the *Curlee* court and this court used the "less necessary" language after discussing and quoting *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1230

34

for the proposition that "[b]y calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case." (See *Curlee*, at p. 722; *People v. Field*, at p. 196.) The *Curlee* court relied on *Haynie* to reject the Attorney General's argument that an error in requiring the defendant to testify during his commitment trial was harmless. (*Curlee*, at p. 722.) After all, if calling a specific witness to testify was necessary, how can it be said that improperly allowing that necessary witness to testify was harmless? We relied on *Haynie* to support our conclusion that, when considering whether equal protection principles have been violated by requiring an SVP to testify at his or her commitment trial, "strict scrutiny is the proper test to apply to the People's justification of the disparate treatment." (*People v. Field*, at p. 196.)

Therefore, underlying the use of the "less necessary" language in *Curlee* and *People v. Field* is the assumption that in calling a defendant to testify at his or her own commitment hearing (whether the defendant be an NGI or SVP), the People are representing to the court the defendant's testimony is *necessary* to the People's case-in-chief. Because NGIs and SVPs are similarly situated regarding the testimonial privilege (see *People v. Field*, *supra*, 1 Cal.App.5th at p. 194; *Curlee*, *supra*, 237 Cal.App.4th at p. 721), it logically follows that the People would have to show that the testimony of an NGI is less necessary than that of an SVP to justify the disparate treatment of SVPs in requiring them to testify at their commitment trials.[11] Accordingly, the "less necessary" language merely reflects the requirement that the People bear the burden to show the disparate treatment is justified under the strict scrutiny test in the context of compelling a witness to testify at a civil

---

[11] Of course, the converse is true as well. The People would need to show that an SVP's testimony was "more necessary" than an NGI's testimony.

commitment trial.  Moreover, we read nothing in *Curlee* or *People v. Field* that modifies the widely accepted strict scrutiny test.

Applying the strict scrutiny standard, the People have the burden of establishing they have a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose.  (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641.) Alternatively stated, applying the strict scrutiny standard, a law "is upheld only if it is necessary to further a compelling state interest. [Citation.]" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1156.)

C.  Analysis

In the instant matter, the People's primary argument is that the trial court erred when it "disregarded . . . differences" between SVPs on the one hand and NGIs on the other.  Specifically, they claim "[t]he heart of the distinction between the two groups is diagnosis: paraphilic disorders for sexually violent predators and psychotic and mood disorders for the others. From that basic and uncontested difference flows numerous differences between the two groups[.]"  Based on these divergences, the People insist that they satisfied their burden of proving that disparate treatment of SVPs is warranted.

Initially, we struggle to see in the record where the trial court "disregarded . . . differences" as the People claim.  Indeed, the trial court acknowledged these differences at length during its explanation of its ruling. Moreover, the People listed these differences as "factual findings" the trial court made.  And the court addressed these differences in explaining its reasons for finding that the People did not satisfy their burden.  Thus, neither the record nor the People's opening brief supports the argument that the trial court simply disregarded the differences between SVPs and NGIs.

36

Rather, the court did not draw the conclusion from those differences that the People urged it to do. The court reaching a conclusion not advocated by the People is not the same as disregarding the differences between SVPs and NGIs. The trial court merely weighed and considered the evidence as it was tasked to do in the evidentiary hearing and then determined that the evidence presented did not satisfy the People's burden. As we explain *post*, we agree with the trial court.

The People place great importance on the fact that NGIs suffer from psychotic symptoms, and SVPs do not. They note that psychotic symptoms are "often readily observable and recognizable by outside observers, even laypeople." Thus, the People emphasize that signs of psychotic episodes can be seen and documented at state hospitals. In comparison, the People argue that SVPs, who typically suffer from paraphilia, do not usually exhibit symptoms while in custody or at a state hospital. Based upon these distinctions, the People then jump to the conclusion that the testimony of an SVP is more necessary than that of an NGI. Yet, they do not persuasively explain why this is so or cite to evidence in the record supporting their position. Moreover, the People's argument about this particular difference appears to somewhat undermine their claim that an NGI's testimony is less necessary.

For example, the People claim that an NGI suffering psychotic disorders will often exhibit "readily observable" symptoms that can be recognized "even [by] laypeople." If this is the case, then a logical argument could be made that NGIs should testify in front of a jury as the members of the jury could easily see whether the NGI is suffering from symptoms. Such a conclusion is supported by our high court's observation that permitting a jury to observe the person sought to be committed and to hear him or her

37

speak and respond provided "the most reliable proof and probative indicator of the person's present mental condition." (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 139.)

In contrast, according to the People, an SVP generally does not exhibit observable symptoms. Thus, it begs the question how an SVP's testimony would be helpful to show that SVP's symptoms. Although several of the People's witnesses testified that a jury could benefit from an SVP's testimony, many of these same witnesses detailed the extensive training one needs to effectively evaluate SVPs and the difficulties of doing so even with sufficient training. For example, Dr. Kelley noted that SVPs can mask their symptoms, requiring trained evaluators "to rely on subtle clues" to evaluate them. If professionals who have been trained to work with, counsel, and evaluate SVPs must rely on "subtle clues," we are left to wonder how a jury could hope to pick up and interpret these same "subtle clues" that an SVP may offer on the witness stand. Similarly, Dr. Clipson emphasized that evaluating SVPs requires a specialized type of assessment with unique assessment methods. There is no indication in the record that anyone testified that jurors possess the necessary assessment methods.

Further, Dr. Phenix, a witness for Respondents, doubted that a juror would be able to evaluate an SVP's testimony to fill in any gaps that evaluators could not observe or evaluate in an institutional setting. For example, she opined that a juror is not "informed or educated about various diagnoses and why they're being offered and what they mean." She also explained that she did not believe a jury "has the experience to identify risk factors that are important and other relevant information to diagnoses and risk assessments." Dr. Phenix emphasized that the members of a jury are

38

not skilled in the evaluation of SVPs and that expert witnesses are needed to articulate the diagnoses of SVPs.

We acknowledge that jurors are often asked to consider scientific issues bearing on guilt or liability as well as tasked with applying evidence to complicated issues. That said, the People here appear to be advocating for something different. They claim that SVPs can mask symptoms and avoid treatment in an institutional setting to such an extent that trained evaluators may not be able to sufficiently evaluate them even though the evaluators have the opportunity to observe SVPs in an institutional setting for extended periods of time. However, the People fail to explain how these same sophisticated and manipulative SVPs could be effectively evaluated by untrained jurors if the SVPs are forced to testify.[12] Instead, it seems that NGIs testifying would be much more helpful to a jury precisely because, as the People's experts agree, even lay people can observe their symptoms. No training is required.

Similarly, the People claim an SVP's testimony is more necessary than that of an NGI because of the difference in triggers. Specifically, the People assert that the jury needs to understand an SVP's triggers. The People also argue that SVPs "follow a script" that is triggered by their "preferred victim group, and they have a preferred approach to offending against members of that group." Then with little explanation except for underscoring the importance of understanding SVP triggers, the People conclude the testimony

_____

[12]    The People also contend that the possibility that expert witnesses might be giving conflicting testimony at an SVP commitment trial warrants compelling a sex offender to testify. We summarily reject this argument. Fact finders are often asked to make credibility determinations and weigh evidence. An SVP commitment trial is not unique in that sense. Moreover, the People offer no evidence or argument regarding the possibility of conflicting expert witnesses at an NGI commitment trial.

of SVPs is more necessary than that of NGIs. We find this argument unpersuasive.

Underlying the People's contention is the assertion that it is difficult for evaluators to observe an SVP's triggers in a controlled environment, like a state hospital. For example, pedophiles, whose psychological trigger is a child, typically will not be interacting with children while under observation at a hospital. Yet, one of the People's expert witnesses, Dr. David Niz,[13] admitted that there were certain proxy behaviors that could be indicative of a sexual interest or sexual drive related to a specific class of victims. These proxy behaviors include deviant fantasies, excessive masturbation, reading certain magazines, viewing specific TV programs or movies, lewd or inappropriate comments toward staff, lying, and manipulative behavior. Additionally, Dr. Niz admitted at trial that he testified as follows during his deposition:

> "You were asked at your deposition, 'Would you agree that common triggers for SVPs tend to not be present at Coalinga State Hospital?' And your answer was, 'No. I believe there are sufficient triggers in the hospital environment. They are here with other similar people in community. They may not have other people they can relate to or discuss interests. In the hospital, they are aware that people around them are interested in the same things, triggers that could come up, sexual talk, shared media. It stresses a trigger. There is a fair amount of stress at Coalinga. And then substance abuse. Even though a secure facility, substances still make their way into the facility.' "

---

[13]   Dr. Niz is the chief of forensic services at Metropolitan State Hospital and graduated with a medical degree from University of California, Davis in 1999. He has been a licensed psychiatrist since 2003.

Moreover, the trial court explicitly noted this evidence, finding as follows:

> "SVPs are documented for proxy behavior for the paraphilias, because the triggers of their sexual urges are the victims, who are, obviously, not present in the State hospital. . . . . [P]roxy behavior that can be documented[ ] includes the discovery of pornography, TV programming regarding children watched by a person reflecting sexual interest, including kid shows, proxy behavior towards staff, including females, or toward fellow peers who appear younger."

Therefore, the People's own evidence and the trial court's conclusion drawn from that evidence undermines the People's argument that an SVP's testimony is necessary so the jury can understand the SVP's triggers. There was evidence presented at the hearing that an SVP's triggers can be observable in a hospital. Further, the People do not explain how a prosecutor would be able to show an SVP's triggers in the controlled environment of a courtroom more effectively or to a greater extent than what evaluators could observe in the hospital setting. Simply put, SVP triggers do not support the People's argument that SVP testimony is more necessary at a commitment trial than NGI testimony.

Additionally, the People emphasize other differences between NGIs and SVPs, but none of these differences show that the testimony of an SVP is more necessary than an NGI's testimony. For example, the People argue that NGIs suffering from psychotic disorders are treated with medication and the effectiveness of that medication can be observed. However, medication does not suppress paraphilia. Thus, cognitive behavior therapy is used to treat SVPs, and the People argue that it is "impossible to ethically test" the success of such therapy "in the state hospital setting." So, the People claim that SVP testimony is more necessary than that of an NGI.

41

This argument suffers from the same flaw as the People's claim that SVPs need to testify because their symptoms or triggers are not easily observable in a hospital setting. The People again seem to imply that evaluators cannot adequately evaluate SVPs in an institution; therefore, the untrained jurors must do so at trial. For the same reasons we discussed *ante*, this argument is unpersuasive.

Also, we note the conditional nature of the People's argument here and how their own evidence belies their position. The People's argument hinges on the fact that SVPs are treated by cognitive behavioral therapy, and the jury needs to evaluate the effectiveness of that therapy during the SVP's testimony. However, the People offered evidence that less than 50 percent of SVPs participate in treatment while in a state hospital. Therefore, based on the People's evidence, it appears that more than half of the SVPs are not engaging in cognitive behavioral therapy whatsoever. Accordingly, it would not be "more necessary" to have many SVPs testify because there would be no need for the jury to evaluate whether the cognitive behavior therapy is working as those SVPs are not participating in such therapy or any other treatment.

The People also contend that the psychotic disorders that plague NGIs can prevent them from giving useful testimony, especially about past offenses. To the contrary, the People insist that individuals experiencing paraphilic disorders do not suffer from the same challenges in testifying about their crimes: "A sex offender has the capacity to give testimony about their offenses that is not tainted by past delusions and hallucinations." As such, the People maintain that the testimony of an SVP is more necessary than that of an NGI. We disagree.

Here, the People are focused on testimony about an SVP's crimes, but an SVP's testimony about his or her past crimes is not required to put such evidence in front of a jury. Indeed, an SVP's record of conviction, police reports, psychological evaluations, and the like could provide sufficient information about an SVP's crimes. Simply put, an SVP's testimony is not necessary to provide jurors with information about past offenses.

We acknowledge that the People claim that SVPs are more legally savvy and sophisticated than NGIs in that SVPs understand hearsay rules, are aware of the implications of *Sanchez*, *supra*, 63 Cal.4th 665, and will take steps to minimize the information that can be used at their commitment trials. To the extent the People are arguing that because SVPs are more likely to make the People follow evidentiary rules and the applicable case law during trial their testimony is more necessary than NGI's testimony, we summarily reject that argument. We assume that the People follow the rules of evidence and the applicable case law in all commitment trials. Thus, requiring the People to behave accordingly at trial cannot be a justification for finding an SVP's testimony more necessary.[14]

However, the People's argument also leads to what appears to have been their primary theme at the evidentiary hearing: There just is not enough information to helpfully evaluate SVPs for purposes of a commitment trial without trial testimony. To this end, the People offered evidence that SVPs participate in treatment at much lower rates than NGIs, have internal organizations that pressure others not to participate in treatment, refuse to

---

[14]    In addition, the People do not cite to anything in the record that shows how often they are prohibited from offering evidence in an SVP commitment trial because of an SVP's objection and the impact, if any, of such occurrences. Importantly, the People do not indicate that they have been unsuccessful in offering evidence at an SVP commitment trial of an individual's past crimes for which he or she was convicted.

be interviewed, see hospitals as oppressive, and view themselves as political prisoners. In other words, SVPs actively take measures to reduce the amount of negative information available that may support their continued confinement. As such, the People assert an SVP's testimony is more necessary than that of an NGI.

Again, this argument regarding the paucity of available information was extensively litigated at the evidentiary hearing. The People offered testimony of several witnesses who discussed the need to interview SVPs, the lack of SVP participation in interviews and treatment, and the difficulty in evaluating SVPs in the hospital setting. Respondents countered with witnesses who minimized the need to interview SVPs to evaluate them and their dangerousness if released. Further, Dr. Phenix testified that she had never found that she did not have sufficient information by which to evaluate an SVP in California. The trial court heard this conflicting evidence, weighed the evidence, and engaged in credibility determinations. To wit, the trial court expressly noted that Dr. Kelley testified about the "huge amounts of records" available in the State of Wisconsin where SVPs cannot be compelled to testify. The court then found the following to be true: "The fact is that in California, the prosecution, defense, and the Court have the same voluminous amounts of records to gather information about the SVP's paraphilic diagnosed mental disorder as well."

Thus, the trial court found that there is an abundance of information available in California that allows for the evaluation of an SVP without that SVP having to testify at a commitment trial. The People have not appropriately challenged this finding or explained why the court is incorrect. Rather, they appear to ask us to reweigh the evidence and make our own finding on this disputed fact. We will not do so. Here, the court found

44

Dr. Phenix more credible on this issue and credited her testimony more than the People's witnesses.[15] However, we independently draw our own legal conclusion from this established fact.

With the finding that there are plenty of records available to evaluators on which to analyze whether an SVP remains a danger to the public if released, we reject the People's claim that SVPs must be made to testify because of a scarcity of information. That said, we still need to address the People's argument that an SVP's failure to sit for interviews with evaluators supports their claim that an SVP's testimony at a commitment trial is more necessary than that of an NGI. As a threshold matter, we note the evidence at the evidentiary hearing was somewhat mixed regarding whether the experts believed an interview with an SVP was needed to adequately evaluate the sex offender. Some experts emphasized the importance of such an interview while others minimized it. The trial court implicitly found that the interviews were not necessary. To this end, the court explained:

> "The question then arises, what is the value of his testimony, considering that SVPs are generally considered deceptive, manipulative, who are—who deny and minimize their crimes, according to the experts? Is it necessary for the People's case, considering all the other voluminous information we have regarding the Respondent?

> "It is a truism in the area of civil commitments that the greatest predictor of future behavior is past behavior.

> Dr. Travis Griffith noted that while the vast majority of overt signs and symptoms of paraphilias [are] discovered by

---

15 The People offered evidence that record keeping may be poor and/or records can be kept in various storage areas making it difficult for evaluators to access all the information. These are institutional or personnel shortcomings. It would be unjust to saddle Respondents with the obligation to overcome personnel or record keeping problems that might be troubling the State.

45

self-report, the sexual behavior and crimes themselves are strong indicators of paraphilias, since they are conduct outside the norm not impacted by the norm, subject to punishment, if continuing despite the awareness of sanctions."

In addition, the court noted that a forensic interview is not required by the DSM for a diagnosis of a paraphilia and "that the most reliable information can be found in historical information . . . and [the individual's] behavior in the community." The court further observed that a forensic interview was not required to score an individual on the Static-99 or to determine the SVP's dynamic risk factors, which can be analyzed based on the sexual offender's history. Thus, the court found that a "[f]orensic interview is . . . not required [for] an evaluator to find that a patient meets SVP criteria, although it might be helpful." Notably, the People do not explain why the trial court's conclusion is incorrect or why it is not supported by the evidence presented. For example, they do not point to anywhere in the record where an expert witness admitted that he or she was unable to testify at an SVP commitment trial because the sexual offender did not participate in any forensic interviews or refused to engage in treatment.

Further, one of the People's expert witnesses undermined the People's claim regarding the relative necessity of an evaluator interviewing a sexual offender to determine whether he or she will qualify as an SVP, specifically considering whether the individual will reoffend once released. To this end, Dr. Flinton testified as follows:

"Q Now, to score the Static-99, you don't need to have an interview, correct?

"A That's correct.

46

"Q Okay. And you said earlier that you can come to an opinion that somebody meets Criterion C, likelihood to reoffend, without actually interviewing the person.

"A Correct.

"Q Would you agree that the meta-analysis, the one by Hanson and Bussiere and then the other one by Hanson and—I think her name is Morton or something like that.

"A Morton and Burgalon (phonetic)

"Q Yeah. [¶] Indicated that the strongest areas that were correlated with risk of reoffense was sexual deviance and anti-social orientation?

"A Correct.

"Q And sexual deviance is determined either by physiological testing or history of offenses, correct?

"A That's correct. So there's really two relatively reliable ways. As we mentioned before with paraphilic disorders, it's sexual fantasies, thoughts, sexual fantasies with urges and/or behaviors. We can also do physiological testing, which would be the penile plethysmograph, or visual reaction testing.

"Q So you don't have to have the individual talk about his fantasies or urges in order to find he meets the criteria?

"A That's right. We can make the assessment based purely on behavior.

"Q In fact, anti-social orientation generally is by behavior too, correct?

"A Yes.

"Q So the two strongest assessments—the two strongest ways to assess risk of reoffense, sexual deviance and anti-social orientation, are ascertainable from behavior, and not really reliable—or not reliably ascertained from self-report?

47

"A  Well, self-report can be very useful.  As I said, you know, a lot of behaviors occur with a certain ecology or situation.  And hearing people talk about their backgrounds and the motivations for their criminal or anti-social behavior can be very helpful.  [¶]  But you can base it just on behavior observation or review of the records."[16]

Also, we observe that underlying the People's argument is that if an SVP will not sit for a forensic interview with an evaluator, the SVP's trial testimony is a reasonable replacement.  We disagree.

As the People's expert witness Dr. Niz noted, during a forensic interview, the evaluator wants "to be friendly and not antagonistic" to get the SVP to answer questions.  Dr. Niz agreed that confrontation is not conducive to gathering the information needed for a forensic interview.  He further emphasized, "[I]f you're antagonistic or very confrontative, that's going to shut down the patient, or the defendant if they're in pre trial.  And you don't want that."  Essentially, Dr. Niz explained that an evaluator in a forensic interview is trying to gather information to provide testimony in court regarding whether the sexual offender should be committed or remain committed as an SVP.  And this approach makes sense considering that the SVPA requires sex offenders to be evaluated by two practicing psychiatrists or psychologists to determine if those individuals have a diagnosed mental disorder and are likely to engage in acts of sexual violence without appropriate treatment and custody.  (See § 6601, subd. (d).)

---

16    The court found Dr. Flinton's testimony on this point credible:  "It has also been noted . . . . the strongest general psychological and clinical presentation is at the bottom of indicators for risk factors for reoffense and that the most accurate predictors of reoffense are:  One, sexual deviancy, and, two, antisocial orientation as determined by past behavior and not by self-report."  We note that Dr. Salter's testimony supported the court's finding on this point as well.

However, at a commitment trial, the People are in a starkly different position than that of the forensic interviewer. The trial is an adversarial proceeding wherein the People are attempting to prove that the defendant is an SVP and should be committed to a state hospital. Indeed, that is the only purpose of the People wanting to call the sexual offender to the witness stand.[17] In this sense, the SVP's compelled trial testimony does not appear to be an adequate substitute for a forensic interview.

In summary, the People have shown that an SVP's compelled testimony could be helpful, and perhaps it would be more helpful than that of an NGI. However, we agree with the trial court that the People have not shown that an SVP's testimony is "more necessary" at a commitment trial than an NGI's testimony. We acknowledge that at a commitment trial to support an initial civil commitment, the People have the burden to prove beyond a reasonable doubt that the sexual offender is an SVP. We also note that the People bear the burden of proving beyond a reasonable doubt that an SVP's condition has not changed, so he or she must remain civilly committed. We do not mean to downplay the difficulty of the People's burden in these cases. That said, we also think it important to consider the nature of SVPs and the Act's requirements for release.

As all the experts at the evidentiary hearing agreed, most SVPs are diagnosed with paraphilia. There is no dispute that paraphilia is a lifelong affliction that typically cannot be treated with medication. Thus, intense cognitive behavior therapy is necessary to allow an SVP to progress to a point

---

[17]    We acknowledge that it could be possible that the People could dismiss a petition in the middle of a commitment trial based on the SVP's trial testimony. However, the People do not make this argument in their briefs. Nor do they point to anywhere in the record indicating this has occurred in California.

where he or she can be released into the public, and even in a controlled environment like a hospital, SVPs often do not go into remission.

For an initial determination, as the trial court noted and no party has challenged, often the heinous nature of the defendant's crimes as well as his or her history is more than sufficient to persuade the jury that the defendant qualifies as an SVP. And to be released thereafter, evidence will need to be presented showing that the SVP has changed, that he or she would not be a danger to the public if released. The SVPA provides for various evaluations of SVPs, some on an annual basis, to analyze an SVP's progress. As the experts consistently testified, if an SVP does not engage in treatment, his or her condition is unlikely to change. In fact, under the SVPA, if an SVP fails to participate in or complete treatment, the People can offer such evidence as proof that the SVP's condition has not changed. (§ 6605, subd. (a)(3).) As such, the following jury instruction may be given: " 'The committed person's failure to participate in or complete the State Department of State Hospitals Sex Offender Commitment Program (SOCP) are facts that, if proved, may be considered as evidence that the committed person's condition has not changed. The weight to be given that evidence is a matter for the jury to determine.' " (*Ibid.*)

We appreciate that many sex offenders do not participate in forensic interviews or treatment. Yet, that decision appears to be a double-edged sword. True, a sex offender can provide information during an interview or treatment that results in an expert testifying at a commitment trial that the sex offender is or remains a danger to the public and is likely to engage in sexually violent behavior if released. Nonetheless, it is unclear from the record before us, how an SVP, once committed, will be able to be considered sufficiently changed to warrant release without, at the very least, engaging in

50

treatment and participating in forensic interviews if not also testifying in court (unless the SVP reaches an advanced age and/or experiences a medical issue that renders him or her unlikely to reoffend).

Against this background, we agree with the trial court that the People have not proven that the disparate treatment of SVPs is justified under the strict scrutiny test.

DISPOSITION

The orders are affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.